Plaintiff, FEDERAL HOME LOAN BANK OF INDIANAPOLIS (hereinafter the "FHLBI" or the "Bank") alleges the following based upon personal knowledge with regard to its own acts, and upon public information as well as information and belief as to all other matters. The Bank's information and belief is based on, among other things, the investigation by its counsel. The investigation included but was not limited to: (1) review and analysis of the Offering Documents for the Certificates that are the subject of this action; (2) interviews with individuals with first hand knowledge of the events alleged herein; (3) examination of relevant SEC filings, press releases and other public statements; (4) review and analysis of pleadings in other civil actions involving certain Defendants; (5) review and analysis of investigations of and complaints filed by state and federal authorities against certain Defendants; (6) published materials, media reports, congressional testimony and additional related materials; and (7) analysis of the performance of the loan pools underlying the securities. Many of the facts related to Plaintiff's allegations are known only by the Defendants, or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is an action for rescission and damages under the: (a) Indiana Uniform Securities Act, Ind. Code §§ 23-19-1-1 *et seq.*; (b) Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (the "33 Act"); and (c) applicable common law.

2.      The Certificates are "securities" within the meaning of the Indiana Uniform Securities Act, I.C. § 23-19-1-2(28), and Section 2(a)(1) of the 33 Act, 15 U.S.C. § 77b(a)(1). Under this statute, the Bank is entitled to rescind its purchase of the Certificates or to be paid damages for its losses on the Certificates.

3.     Pursuant to IC § 23-19-5-9(a), the Bank will tender the Certificates prior to the entry of judgment.

4.     The action arises from the sale of nearly $3 billion in Private Label Mortgage Backed Securities ("PLMBS"), a type of Residential Mortgage Backed Security ("RMBS"), by the Defendants to the Bank.  The Defendants include the depositors/issuers, underwriters/dealers, and certain entities controlling these parties, who offered and sold the PLMBS to the Bank. These Defendants' roles are described in detail below.

5.     Accompanying Defendants' sales or offers of these PLMBS to the Bank were registration statements, prospectuses, supplemental prospectuses, and other written offering materials (collectively, "Offering Documents") that Defendants wrote, signed, and/or circulated, and which contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading.   Attached as Appendix I is a list of the PLMBS Certificates purchased by the Bank that are the subject of this action due to the Defendants' material misstatements and omissions in the Offering Documents described herein.

6.     PLMBS are mortgage pass-through certificate securities entitling the holder to income payments from pools of mortgage loans.[1]  The securities are referred to as "private label" because they are issued by private entities instead of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which are U.S. government-sponsored enterprises ("GSEs").  Mortgage securities issued by Fannie Mae and Freddie Mac are referred to as "agency" mortgage securities.

7.     Traditionally, the GSEs provided liquidity for the residential mortgage market by buying loans that conformed to their underwriting standards and dollar limits.  In the early

---

[1] The terms "PLMBS" and "Certificate(s)" are used interchangeably herein.  Plaintiff identifies the PLMBS Certificates herein using the ticker symbols for each Certificate as created by Bloomberg.

2000s, PLMBS became an increasingly important adjunct to the GSEs, forming a capital market for mortgages that could not be sold to the GSEs. Certain PLMBS were secured by "prime" or "alt-a" mortgages. "Prime" mortgages were mortgages that allegedly met the credit score and other underwriting criteria of the GSEs, but were ineligible for GSE purchase because the mortgages exceeded the applicable GSE dollar limit. "Alt-A" mortgages were also ineligible for GSE due to dollar amount and/or because they contained certain disqualifying terms, such as certain types of adjustable rates, or were supported by reduced documentation. Other PLMBS were secured by "subprime" mortgages. These were mortgages that did not meet the GSE criteria for creditworthiness of the borrower but purportedly satisfied loan underwriting criteria developed by their originators.

8.    Fundamentally, the value of a mortgage pass-through certificate depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral the borrowers provide in the event of default. In the event that borrowers fall behind or default, the investor is exposed to loss. For this reason, rigorous and effective loan underwriting by the mortgage originators, performed in accordance with stated underwriting criteria, is of paramount importance; the absence of it – as demonstrated by this case – renders unreliable any credit rating or other attempt to assess the credit risk of the securities.

9.    PLMBS are segmented into "tranches" with laddered payment priority and varying return potential for security holders. Interests in each tranche are issued in the form of certificates identified by a CUSIP code unique to that certificate. Mortgage payments are collected by the servicing agent and provided to a trustee, who then distributes payments to the investors who hold the securities in accordance with the priority scheme among the various tranches. The most senior tranches enjoy the highest payment priority and lowest risk of default.

Thus, if mortgage payments are not made, the losses are allocated first to the most junior tranches and move upward as the junior tranches are exhausted.

10.     By requirement of the Bank's own internal policy, and in order to minimize the risk of loss, the Bank purchased only the most senior, triple-A ("AAA") rated PLMBS tranches. These tranches purportedly were backed by pools of prime and "Alt-A" mortgage loans. Unfortunately, as detailed herein, the Offering Documents contained serious misstatements and omissions with respect to the mortgage pools, the creditworthiness of the borrowers, the quality of the collateral and the underwriting standards employed in originating the mortgage loans. As a result, despite the original AAA ratings and the abundant representations and warranties regarding the underlying mortgage pools, the Bank has suffered substantial losses on these securities.

11.     Though the securities themselves are complex, the abuses by the Defendants can be put in simple terms. *The Defendants did not tell the Bank the truth about the loans that comprised the mortgage pools securing the PLMBS.* The Bank believed it was buying safe and secure securities with an extremely low risk of default – equivalent, from an investment quality standpoint, to other AAA-rated investments – but in fact, the reality was far different.

12.     Contrary to the way in which Defendants represented them, the PLMBS at issue in this case are simply *not* pools of loans issued to borrowers based on the application of stated underwriting standards or considerations. The ability of the borrowers to pay was not genuinely taken into account by the mortgage originators, and exceptions to underwriting standards were not made due to "compensating circumstances." Instead, the primary motivation was the desire to issue and securitize as many loans as possible in order to receive substantial fees; exceptions to stated underwriting standards became the norm. The Issuers and Underwriters packaged and

4

sold these securities without regard to whether the underlying mortgage pools comported with the detailed descriptions contained in the Offering Documents.

13.     The sale of each PLMBS purchased by the Bank was effected through the Offering Documents provided to the Bank in connection with the offer and sale of these PLMBS. The Offering Documents contained extensive statements regarding underwriting guidelines purportedly used by the mortgage originators, and extensive data supporting the credit quality of the mortgage loans. However, the statements and data and the omissions pertaining to them were materially false and misleading. Had the Bank been provided with truthful, complete and accurate information, it would not have purchased the PLMBS, and would have been spared the substantial losses it has suffered.

14.     Defendants' untrue statements and omissions of material fact went to the heart of the risk of the mortgage pools underlying the PLMBS. Specifically, Defendants failed to accurately describe key characteristics of the mortgages and the securitization of the mortgages, including, but not limited to:

> **a.     The Mortgage Originators' Underwriting Guidelines**. The Offering Documents contained material misstatements and omitted to disclose material information regarding the underwriting guidelines purportedly utilized by the mortgage originators. The Defendants represented that the mortgage originators applied their stated underwriting guidelines and standards when issuing loans to borrowers. However, as set forth in more detail below, the mortgage originators routinely disregarded their own guidelines and granted exceptions without proper justification. Moreover, Defendants knew, or in the exercise of due diligence should have known, that numerous statements contained in the Offering Documents with regard to the efficacy of the underwriting guidelines and the processes used to grant exceptions had no reasonable basis. Consequently, the statements in and omissions from the Offering Documents regarding the mortgage originators' underwriting guidelines rendered the Offering Documents materially false and misleading.

> **b.     The Loan-to-Value Ratios of the Mortgage Loans and the Appraisal Standards Used to Determine the Ratios**. The Offering Documents contained material misstatements and omitted to disclose material information regarding the loan-to-value ("LTV") ratios of the loans in the mortgage pools, and

5

the appraisal standards that were purportedly applied to determine the home values. The LTV ratios were based on appraisals that were inflated as a result of conflicts of interest and inappropriate influence by the mortgage originators who sought to ensure that the appraisals came back at a high enough level to support the loan amount. But the severe flaws in the appraisal process were not disclosed in the Offering Documents. Consequently, the statements in and omissions from the Offering Documents regarding the LTV ratios and appraisal standards rendered the Offering Documents materially false and misleading.

      c.    **Primary Residency**. The Offering Documents contained material misstatements and omitted to disclose material information regarding the primary residency status of the mortgage properties – another key characteristic of the risk of the mortgage loans. The Defendants represented that certain specified percentages of the mortgage loan properties were primary residences of the borrower, instead of "second homes" or "investment properties," which carry more risk. However, in truth, the data provided by Defendants overstated the percentage of homes that were primary residences. Consequently, the statements in and omissions from the Offering Documents regarding the occupancy rates of the homes in the mortgage pools rendered the Offering Documents materially false and misleading.

      d.    **Loan Documentation**. Many of the Offering Documents contained material misstatements and omitted to disclose material information regarding the percentage of loans in the mortgage pool that were originated using full documentation.

      e.    **The Ratings Process**. Many of the Offering Documents contained material misstatements and omitted to disclose material information regarding the bases for the bonds' AAA ratings and ratings process. The Defendants represented that the Credit Rating Agencies conducted analysis that was designed to assess the likelihood of delinquency and defaults in the underlying mortgage pools. However, in truth, the ratings were based on insufficient information and faulty assumptions that vastly understated the true risk of the PLMBS, and overstated the quality of the securities. Consequently, the statements in and omissions from the Offering Documents regarding the PLMBS ratings rendered the Offering Documents materially false and misleading.

      f.    **Sponsors' Due Diligence**. Many of the Offering Documents contained material misstatements and omitted to disclose material information regarding the sponsors' due diligence on the mortgage loans in the PLMBS mortgage pools. The Offering Documents stated that the sponsors or third-parties retained by them inspected the underlying mortgage loans for compliance with the mortgage originators' underwriting and appraisal guidelines, and documentation requirements. However, the Offering Documents omit to state that the sponsors undermined the due diligence process and pressured the third-party due diligence firms to ignore deviations from the applicable underwriting criteria, and that even with regard to loan defects identified through the due diligence process, the

sponsors nonetheless waived the defects as to a substantial percentage of these loans and, in many cases, used this information about defective loans to negotiate lower prices for the loan pools. Consequently, the statements in and omissions from the Offering Documents regarding the sponsors' due diligence on the mortgage loans in the PLMBS mortgage pools rendered the Offering Documents materially false and misleading.

15.     The untrue, incomplete and materially misleading statements summarized above and discussed in detail below were made with respect to each of the PLMBS purchased by the Bank that are the subject of this lawsuit. The Bank reasonably relied on these statements and was misled by the omissions when deciding to purchase the securities, and the statements and omissions have caused the Bank significant losses.

16.     As a result of these untrue statements in and omissions from the Offering Documents, the Bank purchased securities that were far riskier than represented by the Defendants, and that were not in truth "highest investment grade" as stated in the Offering Documents, but, instead, were low quality, high risk securities. As of the date this complaint is filed, all but six of the Certificates at issue in this case have been downgraded to below investment grade, indicating a materially higher probability of default.

## II.    JURISDICTION AND VENUE

17.     This Court has jurisdiction over the claims alleged in this action.

18.     This Court has subject matter jurisdiction over Plaintiff's state law claims, which arise under the Indiana Uniform Securities Act, I.C. §§ 23-19-1-1 *et seq.*, and under common law, because the Bank's claims arise from its transaction of business with Defendants within this State.

19.     This Court has subject matter jurisdiction over Plaintiff's federal claims, which are brought pursuant to §§ 11, 12(a)(2) and 15 of the 33 Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, respectively, and pursuant to Section 22 of the 33 Act, 15 U.S.C. § 77v.

20.     In addition, this Court has subject matter jurisdiction over the claims against Defendants pursuant to I C. § 23-19-5-9, which creates a private right of action against any person who "sells a security in violation of" the Indiana Uniform Securities Act.

21.     The Defendants are subject to personal jurisdiction in this State pursuant to Ind. Trial Rule 4.4(A) because the Bank's claims arise from the transaction of business with Defendants within this State.  Furthermore, the offer and sale to the Bank of the Certificates that are the subject of this action, including certain Defendants' making of materially false and misleading statements and omission of material facts alleged herein, occurred in this State.

22.     Because its activities are not localized in one state, the Bank is not a citizen of any state under 28 U.S.C. § 1332(c), so the Federal courts have no jurisdiction of this action under 28 U.S.C. § 1332(a).  Furthermore, pursuant to Section 22(a) of the 33 Act, 15 U.S.C. § 77v(a), Plaintiff's claims arising under the 33 Act may not be removed to federal court.

23.     Venue is proper in this County pursuant to Ind. Trial Procedure Rule 75(A).  The offer and sale to the Bank of the Certificates that are the subject of this action, including certain Defendants' making of materially false and misleading statements and omission of material facts alleged herein, occurred in this County.

24.     The Bank asserts no claims against any entity that has filed for bankruptcy protection.

## III.   THE PARTIES

**A.     Plaintiff**

25.     Plaintiff is a bank created by the Federal Home Loan Bank Act.  The headquarters of the Bank are in the city of Indianapolis, Marion County.  Under its Organization Certificate, the Bank is to operate in Federal Home Loan Bank District 6, which comprises the states of

Indiana and Michigan. The Bank operates in both of those states. The Bank is not an agency of the United States, and the Bank is not a citizen of any state.

26.     The Bank is federally chartered, but privately capitalized and independently managed. The federal government is not involved in the day-to-day management of the Bank's operations. Management of the Bank is vested by law in the Bank's board of directors, all of whom are elected by the Bank's shareholder members. No tax dollars are involved in the operation of the Bank.

27.     The Bank currently has 409 members. Of those members, 217 are citizens of states other than Indiana, and 192 are citizens of Indiana.

28.     As part of its business, the Bank makes advances, or loans, to its members. In the last fiscal year, 61% of those advances were made to institutions outside of Indiana. Employees of the Bank routinely travel to the offices of the Bank's members. In 2009, employees of the Bank made approximately 180 business trips to members outside of Indiana.

29.     Ten of the Bank's 18 directors have their business addresses outside of Indiana, and 62% of the Bank's stock is owned by members who are based outside of Indiana.

**B.     Defendants**

30.     **The Banc of America Entities**

A.     **Depositor Defendant Banc of America Mortgage Securities, Inc.** is a Delaware corporation. On information and belief, **Banc of America Mortgage Securities, Inc.** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization. **Banc of America Mortgage Securities, Inc.** was the depositor for Certificate BOAMS 2006-1 A1.

B.     **Underwriter and Seller Defendant Banc of America Securities LLC** is a Delaware limited liability company. **Banc of America Securities LLC** underwrote Certificate

BOAMS 2006-1 A1 and sold Certificates BOAMS 2006-1 A1, BSARM 2007-3 1A1 and WAMU 2007-HY2 1A1 directly to the Bank.

C.      **Controlling Person Defendant Bank of America Corporation** is a Delaware corporation.  At all relevant times, **Bank of America Corporation** was the parent company and a controlling entity of **Banc of America Mortgage Securities, Inc.** and **Banc of America Securities LLC.  Bank of America Corporation** was also the parent company of sponsor and originator Bank of America, National Association (sponsor of Certificate BOAMS 2006-1 A1; originator of loans for the offering in which the Bank purchased Certificates BOAMS 2006-1 A1 and GSR 2005-2F 2A1).

31.     **The Bear Stearns Entities**

A.      **Underwriter and Seller Defendant Bear, Stearns & Co. Inc.** is a Delaware corporation.  **Bear, Stearns & Co. Inc.** underwrote Certificates BSARM 2007-3 1A1 and CWHL 2007-13 A4 and sold Certificate CWHL 2007-13 A4 directly to the Bank.

B.      **Depositor Defendant Structured Asset Mortgage Investments II Inc.** is a Delaware corporation.  On information and belief, **Structured Asset Mortgage Investments II Inc.** was formed and existed solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization.  **Structured Asset Mortgage Investments II Inc.** was the depositor for Certificate BSARM 2007-3 1A1.

C.      **Controlling Person Defendant The Bear Stearns Companies Inc.** is a Delaware corporation.  At the time the Bank acquired the relevant Certificate(s), **The Bear Stearns Companies Inc.** was the parent company and a controlling entity of **Bear, Stearns & Co. Inc.** and **Structured Asset Mortgage Investments II Inc.  The Bear Stearns Companies Inc.** was also the parent company of sponsor EMC Mortgage Corporation (sponsor of Certificate

BSARM 2007-3 1A1).  On or about July 6, 2008, **The Bear Stearns Companies, Inc.** legally changed its name to **The Bear Stearns Companies LLC**.  All references herein to **The Bear Stearns Companies, Inc.** are also to **The Bear Stearns Companies LLC**.

32.     **Underwriter Defendant Citigroup Global Markets Inc.** is a New York corporation.  **Citigroup Global Markets Inc.** underwrote Certificate FHASI 2004-7 1A1.

33.     **The Countrywide Entities**

A.     **Depositor Defendant CWMBS, Inc.** is a Delaware corporation.  On information and belief, **CWMBS, Inc.** was formed and existed solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization.  **CWMBS, Inc.** was the depositor for Certificates CWHL 2007-8 1A5, CWHL 2005-8R A1 and CWHL 2007-13 A4.

B.     **Controlling Person Defendant Countrywide Financial Corporation** is a Delaware corporation.  At the time the Bank acquired the relevant Certificate(s), **Countrywide Financial Corporation** was a holding company which, through its subsidiaries, was engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting. **Countrywide Financial Corporation** managed its business through five business segments: Mortgage Banking; Banking; Capital Markets; Insurance; and Global Operations.  The mortgage banking business segment was **Countrywide Financial Corporation's** core business and generated 48 percent of the Countrywide Financial Corporation's pre-tax earnings in 2006.  At all relevant times, **Countrywide Financial Corporation** was the parent company and a controlling entity of **CWMBS, Inc.**  **Countrywide Financial Corporation** was also the parent company of sponsor and originator Countrywide Home Loans, Inc. (sponsor of Certificates CWHL 2007-8 1A5 and CWHL 2007-13 A4), an originator of loans for the offerings in which

the Bank purchased Certificates BSARM 2007-3 1A1, CWHL 2007-8 1A5, CWHL 2005-8R A1,

CWHL 2007-13 A4, GSR 2006-2F 3A1, GSR 2006-AR1 2A3, GSR 2006-1F 2A2, GSR 2005-

3F 2A1, GSR 2005-1F 3A1, GSR 2005-2F 2A1, and GSR 2006-6F 2A1.

    34.    **The Credit Suisse Entities**

    A.    **Depositor Defendant Credit Suisse First Boston Mortgage Securities Corp.** is

a Delaware corporation.  On information and belief, **Credit Suisse First Boston Mortgage**

**Securities Corp.** was formed and exists solely for the purpose of receiving and depositing loans

into trusts for PLMBS securitization.  **Credit Suisse First Boston Mortgage Securities Corp.**

was the depositor for Certificate CSFB 2005-8 9A1.

    B.    **Underwriter and Seller Defendant Credit Suisse First Boston LLC** is a

Delaware limited liability company.  On January 23, 2006, **Credit Suisse First Boston LLC**

changed its name to **Credit Suisse Securities (USA) LLC**.  The name change became effective

January 16, 2006.  All references herein to **Underwriter Credit Suisse First Boston LLC** are

also to **Credit Suisse Securities (USA) LLC**.  **Credit Suisse First Boston LLC** underwrote

Certificates CWHL 2007-8 1A5, CSFB 2005-8 9A1 and WFMBS 2006-10 A7 and sold

Certificates CWHL 2007-8 1A5, CSFB 2005-8 9A1, RFMSI 2007-SA4 3A1, WAMU 2007-HY1

4A1 and WFMBS 2006-10 A7 directly to the Bank.

    C.    **Controlling Person Defendant Credit Suisse (USA), Inc.** is a Delaware

corporation.  **Credit Suisse (USA), Inc.** is the parent company and a controlling entity of wholly

owned subsidiaries **Credit Suisse First Boston Mortgage Securities Corp.** and **Credit Suisse**

**First Boston LLC.** **Credit Suisse (USA), Inc.** is also the parent of wholly owned subsidiary

DLJ Mortgage Capital LLC, which was the sponsor and an originator of loans for the offering in

which the Bank purchased Certificate CSFB 2005-8 9A1.

D.      **Controlling Person Defendant Credit Suisse Holdings (USA), Inc.** is a Delaware corporation.  **Credit Suisse Holdings (USA), Inc.** is the parent company and a controlling entity of wholly owned subsidiaries **Credit Suisse (USA), Inc., Credit Suisse First Boston Mortgage Securities Corp.** and **Credit Suisse First Boston LLC.  Credit Suisse Holdings (USA), Inc.** is also the parent of wholly owned subsidiary DLJ Mortgage Capital LLC.

35.    **The First Horizon Entities**

A.      **Depositor Defendant First Horizon Asset Securities, Inc.** is a Delaware corporation.  On information and belief, **First Horizon Asset Securities, Inc.** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization.  **First Horizon Asset Securities, Inc.** was the depositor for Certificate FHASI 2004-7 1A1.

B.      Controlling Person First Horizon Home Loan Corporation, a Kansas corporation, was the parent company and a controlling entity of **First Horizon Asset Securities, Inc.**, as well as sponsor of, and an originator of loans for, the offering in which the Bank purchased Certificate FHASI 2004-7 1A1.  During 2007, First Horizon Home Loan Corporation merged with and into its parent corporation and **Controlling Person Defendant First Tennessee Bank National Association**, and continues, through its divisions, to do business as divisions of **First Tennessee Bank National Association.  First Tennessee Bank National Association** is therefore named herein as a Defendant as the controlling entity of both **First Horizon Asset Securities, Inc.** and First Horizon Home Loan Corporation.

36.    **Depositor Defendant First Savings Mortgage Corporation** is a Virginia corporation.  On information and belief, **First Savings Mortgage Corporation** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS

securitization.  **First Savings Mortgage Corporation** was the depositor for Certificate STARM 2007-4 2A2 and also an originator of loans for the offering in which the Bank purchased Certificate RFMSI 2006-S4 A3.

     37.    **The GMAC Entities**

     A.    **Depositor Defendant Residential Funding Mortgage Securities I, Inc.** is a Delaware corporation.  On information and belief, **Residential Funding Mortgage Securities I, Inc.** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization.  **Residential Funding Mortgage Securities I, Inc.** was the depositor for Certificates RFMSI 2007-S4 A4, RFMSI 2007-SA4 3A1 and RFMSI 2006-S4 A3.

     B.    **Underwriter Defendant Residential Funding Securities, LLC**, also known at times relevant hereto as GMAC RFC Securities (hereafter together referred to as **Residential Funding Securities, LLC**) is a Delaware limited liability company.  **Residential Funding Securities, LLC** underwrote Certificate RFMSI 2007-SA4 3A1.

     C.    **Controlling Person Defendant GMAC Mortgage Group, Inc.**, also known currently and at times relevant hereto as **GMAC Mortgage Group LLC** (hereafter, together referred to as "**GMAC Mortgage Group, Inc.**") is a Delaware corporation or limited liability company, respectively.  **GMAC Mortgage Group, Inc.** is the parent corporation or limited liability company, respectively, with 100% direct or indirect ownership, and controlling entity of **Residential Funding Mortgage Securities I, Inc.** and **Residential Funding Securities, LLC.** **GMAC Mortgage Group, Inc.** is also the parent of  GMAC Mortgage, LLC (an originator of loans for the offering in which the Bank purchased Certificates RFMSI 2007-S4 A4 and RFMSI 2007-SA4 3A1), GMAC Mortgage Corporation (an originator of loans for the offering in which the Bank purchased Certificates GSR 2006-2F 3A1 and GSR 2006-AR1 2A3), HomeComings

Financial, LLC (an originator of loans for the offering in which the Bank purchased Certificates RFMSI 2007-S4 A4 and RFMSI 2007-SA4 3A1), HomeComings Financial Network, Inc. (an originator of loans for the offering in which the Bank purchased Certificate RFMSI 2006-S4 A3, Residential Funding Corporation (sponsor of Certificate RFMSI 2006-S4 A3) and Residential Funding Company, LLC (sponsor of Certificates RFMSI 2007-S4 A4 and RFMSI 2007-SA4 3A1).

D.  **Controlling Person Defendant GMAC Inc.**, also known at times relevant hereto as **GMAC LLC** (hereafter, together referred to as "**GMAC Inc.**"), is a Delaware corporation or limited liability company, respectively. **GMAC Inc.** offers mortgage services, including originating, purchasing, selling, and securitizing residential mortgage loans; servicing residential mortgage loans; and providing collateralized lines of credit to other mortgage originators. **GMAC Inc.** is the parent corporation or limited liability company, respectively, and controlling entity of **Residential Funding Mortgage Securities I, Inc., Residential Funding Securities, LLC** and **GMAC Mortgage Group, Inc. GMAC Inc.** is also the parent of GMAC Mortgage, LLC (an originator of loans for the offering in which the Bank purchased Certificates RFMSI 2007-S4 A4 and RFMSI 2007-SA4 3A1), GMAC Mortgage Corporation (an originator of loans for the offering in which the Bank purchased Certificates GSR 2006-2F 3A1 and GSR 2006-AR1 2A3), HomeComings Financial, LLC (an originator of loans for the offering in which the Bank purchased Certificates RFMSI 2007-S4 A4 and RFMSI 2007-SA4 3A1), HomeComings Financial Network, Inc. (an originator of loans for the offering in which the Bank purchased Certificate RFMSI 2006-S4 A3), Residential Funding Corporation (sponsor of Certificate RFMSI 2006-S4 A3) and Residential Funding Company, LLC (sponsor of Certificates RFMSI 2007-S4 A4 and RFMSI 2007-SA4 3A1).

E.     On May 10, 2010, **GMAC Inc.** changed its corporate name to **Ally Financial Inc.** All references herein to **GMAC Inc.** are also to **Ally Financial Inc.**

38.    **The Goldman, Sachs Entities**

A.     **Depositor Defendant GS Mortgage Securities Corp.** is a Delaware corporation. On information and belief, **GS Mortgage Securities Corp.** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization. **GS Mortgage Securities Corp.** was the depositor for Certificates GSR 2006-2F 3A1, GSR 2006-AR1 2A3, GSR 2006-1F 2A2, GSR 2005-7F 3A7, GSR 2005-3F 2A1, GSR 2005-1F 3A1, GSR 2005-2F 2A1 and GSR 2006-6F 2A1, as well as the sponsor of Certificate GSR 2005-3F 2A1 and GSR 2005-2F 2A1.

B.     **Underwriter and Seller Defendant Goldman, Sachs & Co.** is a New York corporation. **Goldman, Sachs & Co.** underwrote and sold directly to the Bank the following Certificates: CWHL 2005-8R A1, GSR 2006-2F 3A1, GSR 2006-AR1 2A3, GSR 2006-1F 2A2, GSR 2005-7F 3A7, GSR 2005-3F 2A1, GSR 2005-1F 3A1, GSR 2005-2F 2A1, GSR 2006-6F 2A1, STARM 2007-4 2A2, WAMU 2005-AR18 1A2, and WFMBS 2007-11 A2. **Goldman, Sachs & Co.** was also the sponsor of Certificate CWHL 2005-8R A1.

C.     **Controlling Person Defendant Goldman Sachs Mortgage Company**, a New York limited partnership, is the parent company and a controlling entity of **GS Mortgage Securities Corp.**, as well as the sponsor of Certificates GSR 2006-2F 3A1, GSR 2006-AR1 2A3, GSR 2006-1F 2A2, GSR 2005-7F 3A7, GSR 2005-1F 3A1, and GSR 2006-6F 2A1.

D.     **Controlling Person Defendant The Goldman Sachs Group Inc.**, a Delaware corporation, is the parent company and a controlling entity of **Goldman Sachs Mortgage Company, Goldman, Sachs & Co.** and **GS Mortgage Securities Corp.**

39.      **Underwriter and Seller Defendant Greenwich Capital Markets, Inc.** is a Delaware corporation.  **Greenwich Capital Markets, Inc** is a registered broker-dealer engaged in the U.S. government securities market and related capital markets business, and underwrote and sold directly to the Bank Certificate RFMSI 2007-S4 A4, RFMSI 2006-S4 A3 and WFMBS 2007-4 A16.  Pursuant to its Restated Certificate of Incorporation, dated April 1, 2009, **Greenwich Capital Markets, Inc.** legally changed its name to **RBS Securities Inc.**  All references herein to **Greenwich Capital Markets, Inc.** are also to **RBS Securities Inc.**

40.      **Depositor Defendant IndyMac MBS, Inc.** is a Delaware corporation.  On information and belief, **IndyMac MBS, Inc.** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization.  **IndyMac MBS, Inc.** was the depositor for Certificates RAST 2005-A11 2A1.

41.      **The JP Morgan Chase Entities**

A.      **Depositor Defendant J.P. Morgan Acceptance Corporation I** is a Delaware corporation.  On information and belief, **J.P. Morgan Acceptance Corporation I** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization.  **J.P. Morgan Acceptance Corporation I** was the depositor for Certificate JPMMT 2005-A8 2A2.

B.      **Depositor Defendant Chase Mortgage Finance Corporation** is a Delaware corporation.  On information and belief, **Chase Mortgage Finance Corporation** was formed and exists to receive and deposit loans into trusts for PLMBS securitization.  **Chase Mortgage Finance Corporation** was the depositor and sponsor for Certificate CHASE 2005-A2 1A4.

C.      **Underwriter and Seller Defendant J.P. Morgan Securities Inc.** is a Delaware corporation.  **J.P. Morgan Securities Inc.** underwrote and sold directly to the Bank Certificates CHASE 2005-A2 1A4, JPMMT 2005-A8 2A2 and WAMU 2005-AR16 1A2.

D.      **Controlling Person Defendant JPMorgan Securities Holdings LLC**, a Delaware corporation, is the parent company and controlling entity of **J.P. Morgan Acceptance Corporation I** and **J.P. Morgan Securities Inc.**

E.      **Controlling Person Defendant JPMorgan Chase & Co.**, a Delaware corporation, is the parent company and controlling entity of **JPMorgan Securities Holdings LLC, J.P. Morgan Acceptance Corporation I, J.P. Morgan Securities Inc., JP Morgan Chase & Co.** and **Chase Mortgage Finance Corporation** is also the parent company of J.P. Morgan Mortgage Acquisition Corp., sponsor of Certificate JPMMT 2005-A8 2A2, Chase Home Finance LLC, an originator of loans for the offering in which the Bank purchased Certificate CHASE 2005-A2 1A4.

42.     **Underwriter and Seller Defendant UBS Securities LLC** is a Connecticut limited liability company.  **UBS Securities LLC** underwrote Certificates RAST 2005-A11 2A1 and WFMBS 2007-10 1A10, and sold Certificates FHASI 2004-7 1A1, RAST 2005-A11 2A1, and WFMBS 2007-10 1A10 directly to the Bank.

43.     **The WaMu Entities**

A.      **Depositor Defendant WaMu Asset Acceptance Corp.** is a Delaware corporation.  **WaMu Asset Acceptance Corp.** was the depositor for Certificates WAMU 2005-AR14 1A2, WAMU 2005-AR16 1A2, WAMU 2005-AR18 1A2, WAMU 2007-HY1 4A1 and WAMU 2007-HY2 1A1.

B.      **Underwriter Defendant WaMu Capital Corp.** is a Delaware corporation. **WaMu Capital Corp.** underwrote Certificates WAMU 2005-AR14 1A2, WAMU 2005-AR16 1A2, WAMU 2005-AR18 1A2, WAMU 2007-HY1 4A1 and WAMU 2007-HY2 1A1.

44.     **The Wells Fargo Entities**

A.      **Depositor Defendant Wells Fargo Asset Securities Corporation** is a Delaware corporation.  On information and belief, **Wells Fargo Asset Securities Corporation** was formed and exists solely for the purpose of receiving and depositing loans into trusts for PLMBS securitization.  **Wells Fargo Asset Securities Corporation** was the depositor for Certificates WFMBS 2007-10 1A10, WFMBS 2005-AR12 2A2, WFMBS 2006-10 A7, WFMBS 2007-4 A16 and WFMBS 2007-11 A2.

B.      **Controlling Person Defendant Wells Fargo Bank, National Association**, is the parent corporation and controlling entity of **Wells Fargo Asset Securities Corporation**.  **Wells Fargo Bank, National Association** was also the sponsor of Certificates WFMBS 2007-10 1A10, WFMBS 2005-AR12 2A2, WFMBS 2006-10 A7, WFMBS 2007-4 A16 and WFMBS 2007-11 A2 and an originator of loans for the offering in which the Bank purchased Certificates GSR 2006-AR1 2A3, GSR 2005-1F 3A1, WFMBS 2007-10 1A10, WFMBS 2005-AR12 2A2, WFMBS 2006-10 A7, WFMBS 2007-4 A16 and WFMBS 2007-11 A2.

C.      **Controlling Person Defendant Wells Fargo & Company**, a Delaware corporation, is the parent corporation, with 100% direct or indirect ownership, and controlling entity of **Wells Fargo Asset Securities Corporation** and **Wells Fargo Bank, National Association**.  **Wells Fargo & Company** is a diversified financial services company that provides retail, commercial and corporate banking services.  It has banking stores located in 39 states and the District of Columbia.  Wells Fargo & Company provides additional financial

services through subsidiaries that are engaged in various businesses, including: wholesale banking, mortgage banking, consumer finance, commercial finance, securities brokerage and investment banking, insurance agency and brokerage services, and, mortgage-backed securities servicing.

45.    In sum, the "**Depositor/Issuer Defendants**," listed below, received or purchased and transferred or sold pools of assets to the issuing trusts identified below, and securitized in the bonds listed below, and were the "issuers" of the securities:[2]

| Depositor Defendant | Issuing Trust | Certificate(s) |
|---|---|---|
| Banc of America Mortgage Securities, Inc. | Banc of America Mortgage 2006-1 Trust | BOAMS 2006-1 A1 |
| Chase Mortgage Finance Corporation | Chase Mortgage Finance Trust Series 2005-A2 | CHASE 2005-A2 1A4 |
| Credit Suisse First Boston Mortgage Securities Corp. | Credit Suisse First Boston Mortgage-Backed P/T Certificates, Series 2005-8 Trust | CSFB 2005-8 9A1 |
| CWMBS, Inc. | CHL Mortgage Pass-Through Trust 2007-8 | CWHL 2007-8 1A5 |
| | Resecuritization Pass-Through Trust 2005-8R | CWHL 2005-8R A1 |
| | CHL Mortgage Pass-Through Trust 2007-13 | CWHL 2007-13 A4 |
| First Horizon Asset Securities, Inc. | First Horizon Mortgage Pass-Through Trust 2004-7 | FHASI 2004-7 1A1 |
| First Savings Mortgage Corporation | STARM Mortgage Loan Trust 2007-4 | STARM 2007-4 2A2 |
| GS Mortgage Securities Corp. | GSR Mortgage Loan Trust 2006-2F | GSR 2006-2F 3A1 |
| | GSR Mortgage Loan Trust 2006-AR1 | GSR 2006-AR1 2A3 |
| | GSR Mortgage Loan Trust 2006-1F | GSR 2006-1F 2A2 |
| | GSR Mortgage Loan Trust 2005-7F | GSR 2005-7F 3A7 |
| | GSR Mortgage Loan Trust 2005-3F | GSR 2005-3F 2A1 |
| | GSR Mortgage Loan Trust 2005-1F | GSR 2005-1F 3A1 |
| | GSR Mortgage Loan Trust 2005-2F | GSR 2005-2F 2A1 |
| | GSR Mortgage Loan Trust 2006-6F | GSR 2006-6F 2A1 |
| IndyMac MBS, Inc. | Residential Asset Securitization Trust 2005-A11CB | RAST 2005-A11 2A1 |

---

[2] *See* 17 C.F.R. § 230.191 ("The depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the issuer for purposes of the asset-backed securities of that issuing entity").

| Depositor Defendant | Issuing Trust | Certificate(s) |
|---|---|---|
| J.P. Morgan Acceptance Corporation I | J.P. Morgan Mortgage Trust 2005-A8 | JPMMT 2005-A8 2A2 |
| Residential Funding Mortgage Securities I, Inc. | RFMSI Series 2007-S4 Trust | RFMSI 2007-S4 A4 |
| | RFMSI Series 2007-SA4 Trust | RFMSI 2007-SA4 3A1 |
| | RFMSI Series 2006-S4 Trust | RFMSI 2006-S4 A3 |
| Structured Asset Mortgage Investments II Inc. | Bear Stearns ARM Trust  2007-3 | BSARM 2007-3 1A1 |
| WaMu Asset Acceptance Corp. | WaMu Mortgage Pass-Through Certificates Series 2005-AR14 Trust | WAMU 2005-AR14 1A2 |
| | WaMu Mortgage Pass-Through Certificates Series 2005-AR16 Trust | WAMU 2005-AR16 1A2 |
| | WaMu Mortgage Pass-Through Certificates Series 2005-AR18 Trust | WAMU 2005-AR18 1A2 |
| | WaMu Mortgage Pass-Through Certificates Series 2007-HY1 Trust | WAMU 2007-HY1 4A1 |
| | WaMu Mortgage Pass-Through Certificates Series 2007-HY2 Trust | WAMU 2007-HY2 1A1 |
| Wells Fargo Asset Securities Corporation | Wells Fargo Mortgage Backed Securities 2007-10 Trust | WFMBS 2007-10 1A10 |
| | Wells Fargo Mortgage Backed Securities 2005-AR12 Trust | WFMBS 2005-AR12 2A2 |
| | Wells Fargo Mortgage Backed Securities 2006-10 | WFMBS 2006-10 A7 |
| | Wells Fargo Mortgage Backed Securities 2007-4 Trust | WFMBS 2007-4 A16 |
| | Wells Fargo Mortgage Backed Securities 2007-11 Trust | WFMBS 2007-11 A2 |

46.     In sum, the following Defendants, collectively referred to as the "**Underwriter Defendants**," purchased the securities identified herein from the Depositor/Issuer Defendants (defined and identified above) and offered or sold the securities to the Bank:

| Underwriter Defendant | Certificate(s) |
|---|---|
| Banc of America Securities LLC | BOAMS 2006-1 A1 |
| Bear, Stearns & Co. Inc. | BSARM 2007-3 1A1 |

| Underwriter Defendant | Certificate(s) |
|---|---|
| | CWHL 2007-13 A4 |
| Citigroup Global Markets Inc. | FHASI 2004-7 1A1 |
| Credit Suisse First Boston LLC | CWHL 2007-8 1A5 |
| | CSFB 2005-8 9A1 |
| | WFMBS 2006-10 A7 |
| Goldman, Sachs & Co. | CWHL 2005-8R A1 |
| | GSR 2006-2F 3A1 |
| | GSR 2006-AR1 2A3 |
| | GSR 2006-1F 2A2 |
| | GSR 2005-7F 3A7 |
| | GSR 2005-3F 2A1 |
| | GSR 2005-1F 3A1 |
| | GSR 2005-2F 2A1 |
| | GSR 2006-6F 2A1 |
| | STARM 2007-4 2A2 |
| | WAMU 2005-AR18 1A2 |
| | WFMBS 2007-11 A2 |
| Greenwich Capital Markets, Inc. | RFMSI 2007-S4 A4 |
| | RFMSI 2006-S4 A3 |
| | WFMBS 2007-4 A16 |
| J.P. Morgan Securities Inc. | CHASE 2005-A2 1A4 |
| | JPMMT 2005-A8 2A2 |
| | WAMU 2005-AR16 1A2 |
| Residential Funding Securities, LLC | RFMSI 2007-SA4 3A1 |
| UBS Securities LLC | RAST 2005-A11 2A1 |
| | WFMBS 2007-10 1A10 |
| WaMu Capital Corp. | WAMU 2005-AR14 1A2 |
| | WAMU 2005-AR16 1A2 |
| | WAMU 2005-AR18 1A2 |
| | WAMU 2007-HY1 4A1 |
| | WAMU 2007-HY2 1A1 |

47.    In sum, the following Defendants, collectively referred to as the "**Seller**

**Defendants**," sold the securities identified below directly to the Bank:

| Seller Defendant | Certificate(s) |
|---|---|
| Banc of America Securities LLC | BOAMS 2006-1 A1 |
| | BSARM 2007-3 1A1 |
| | WAMU 2007-HY2 1A1 |
| Bear, Stearns & Co. Inc. | CWHL 2007-13 A4 |
| Credit Suisse First Boston LLC | CWHL 2007-8 1A5 |
| | CSFB 2005-8 9A1 |
| | RFMSI 2007-SA4 3A1 |

| Seller Defendant | Certificate(s) |
|---|---|
| | WAMU 2007-HY1 4A1 |
| | WFMBS 2006-10 A7 |
| Goldman, Sachs & Co. | CWHL 2005-8R A1 |
| | GSR 2006-2F 3A1 |
| | GSR 2006-AR1 2A3 |
| | GSR 2006-1F 2A2 |
| | GSR 2005-7F 3A7 |
| | GSR 2005-3F 2A1 |
| | GSR 2005-1F 3A1 |
| | GSR 2005-2F 2A1 |
| | GSR 2006-6F 2A1 |
| | STARM 2007-4 2A2 |
| | WAMU 2005-AR18 1A2 |
| | WFMBS 2007-11 A2 |
| Greenwich Capital Markets, Inc. | RFMSI 2007-S4 A4 |
| | RFMSI 2006-S4 A3 |
| | WFMBS 2007-4 A16 |
| J.P. Morgan Securities Inc. | CHASE 2005-A2 1A4 |
| | JPMMT 2005-A8 2A2 |
| | WAMU 2005-AR16 1A2 |
| UBS Securities LLC | FHASI 2004-7 1A1 |
| | RAST 2005-A11 2A1 |
| | WFMBS 2007-10 1A10 |

48.     In sum, the following Defendants, collectively referred to as the "**Controlling Person Defendants**," controlled the Issuer/Depositor Defendants and/or Underwriter Defendants:

| Controlling Person Defendant | Controlled Defendant | Defendant |
|---|---|---|
| Bank of America Corporation | Banc of America Mortgage Securities, Inc. | Depositor |
| | Banc of America Securities LLC | Underwriter |
| Countrywide Financial Corporation | CWMBS, Inc. | Depositor |
| Credit Suisse (USA), Inc. | Credit Suisse First Boston LLC | Underwriter |
| | Credit Suisse First Boston Mortgage Securities Corp. | Depositor |
| Credit Suisse Holdings (USA), Inc. | Credit Suisse First Boston LLC | Underwriter |

| Controlling Person Defendant | Controlled Defendant | Defendant |
|---|---|---|
| | Credit Suisse First Boston Mortgage Securities Corp. | Depositor |
| First Tennessee Bank National Association | First Horizon Asset Securities, Inc. | Depositor |
| GMAC Inc. | Residential Funding Mortgage Securities I, Inc. | Depositor |
| | Residential Funding Securities, LLC | Underwriter |
| GMAC Mortgage Group, Inc. | Residential Funding Mortgage Securities I, Inc. | Depositor |
| | Residential Funding Securities, LLC | Underwriter |
| Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Depositor |
| JPMorgan Chase & Co. | J.P. Morgan Acceptance Corporation I | Depositor |
| | Chase Mortgage Finance Corporation | Depositor |
| | J.P. Morgan Securities Inc. | Underwriter |
| JPMorgan Securities Holdings LLC | J.P. Morgan Acceptance Corporation I | Depositor |
| | J.P. Morgan Securities Inc. | Underwriter |
| The Bear Stearns Companies Inc. | Bear, Stearns & Co. Inc. | Underwriter |
| | Structured Asset Mortgage Investments II Inc. | Depositor |
| The Goldman Sachs Group Inc. | Goldman, Sachs & Co. | Underwriter |
| | GS Mortgage Securities Corp. | Depositor |
| Wells Fargo & Company | Wells Fargo Asset Securities Corporation | Depositor |
| Wells Fargo Bank, National Association | Wells Fargo Asset Securities Corporation | Depositor |

## C.    The John Doe Defendants

49.    Defendants John Doe 1-50 are other Issuer/Depositors, Underwriters, Sellers, Controlling Persons, and/or others who are jointly and severally or otherwise liable for the misstatements, omissions, and other wrongful conduct alleged herein, including the liability with respect to the Certificates at issue in this case.  The John Does may include persons or entities who are not named as Defendants at this time because Plaintiff has insufficient information as to

the extent, if any, of their involvement in and liability for the matters alleged herein. Plaintiff will amend this Complaint to allege the true names and capacities of these Defendants when ascertained.

## IV.   FACTUAL BACKGROUND

**A.     Mechanics of Mortgage Backed Securities**

**1.     The Securitization Process**

50.     Like all residential mortgage backed securities, the PLMBS purchased by the Bank were created in a process known as "mortgage securitization." Mortgage securitization is a process by which mortgage loans are acquired from "mortgage originators," pooled together, and securities constituting interests in the cash flow from the mortgage pools are then sold to investors. The securities are referred to as "mortgage pass-through securities" because the cash flow from the pool of mortgages is "passed through" to the securities holders when payments are made by the underlying mortgage borrowers.

51.     Securitization involves several entities who perform distinct tasks, though, as often was the case with the PLMBS purchased by the Bank, many or all of the entities may be subsidiaries or affiliates of a single parent or holding company. *See* § IV.D below. The first step in creating a mortgage pass-through security such as the PLMBS purchased by the Bank is the acquisition by "**depositor**" (referred to herein as "depositor" or "depositor/issuer") of an inventory of loans from a "**sponsor**" or "**seller**" which either originates the loans or acquires the loans from other mortgage originators in exchange for cash. The depositor is often a subsidiary or other affiliate of, and controlled by, the sponsor. *See id.*

52.     The depositor then securitizes the pool of loans by forming one or more mortgage pools with the inventory of loans, and creating tranches of interests in the mortgage pools with

various levels of seniority.  Interests in these tranches are then issued by the depositor (who then serves as the "**issuer**") through a trust in the form of bonds, or certificates.

53.    Each tranche has a different level of purported risk and reward, and, often, a different rating.  The most senior tranches often receive the highest investment grade rating, AAA.  Junior tranches, which usually have lower ratings, are more exposed to risk, but offer higher potential returns.  The most senior tranches of securities will be entitled to payment in full before the junior tranches.  Conversely, losses on the underlying loans in the asset pool -- whether due to default, delinquency, or otherwise – are allocated first to the most subordinate or junior tranche of securities, then to the tranche above that.  This hierarchy in the division of cash flows is referred to as the "**flow of funds**" or "**waterfall**."

54.    The depositor/issuer works with the nationally recognized credit rating agencies, Fitch, Moody's, and Standard & Poor's (collectively, "Credit Rating Agencies"), to ensure that each tranche of the mortgage pass-through certificate receives the rating desired by the depositor/issuer (and underwriter).  For PLMBS, this meant a AAA rating for the senior tranche, and lower ratings for the subordinated tranches  Once the asset pool is securitized, the certificates are issued to one or more "**underwriters**" (typically Wall Street banks), who resell them to investors, such as the Bank.

55.    Because the cash flow from the loans in the mortgage pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends largely on the credit quality of the loans in the mortgage pool.  The collateral pool for PLMBS often includes thousands of loans.  Detailed information about the credit quality of the loans is contained in the "loan files" developed and maintained by the mortgage originators – originators that are often, and as identified herein, affiliated with and/or controlled

by other parties to the securitization or one or more common controlling entities – when making the loans. For residential mortgage loans, such as the loans that backed the PLMBS purchased by the Bank, each loan file normally contains documents including the borrower's application for the loan, verification of income, assets, and employment, references, credit reports, an appraisal of the property that will secure the loan and provide the basis for other measures of credit quality, such as loan-to-value ratios, and occupancy status. The loan file should also include notes from the person who underwrote the loan describing the loan's purported compliance with underwriting guidelines, and documentation of "compensating factors" that justified any departure from those standards.

56.    Investors in PLMBS do not have access to the loan files. Instead, the sponsors, depositors/issuers, and the underwriters – parties to the securitization that are often, and as identified herein, affiliated with and/or controlled by other parties to the securitization or one or more common controlling entities – are responsible for gathering and verifying information about the credit quality and characteristics of the loans that are deposited into the trust, and presenting this information in prospectuses or other offering documents that are prepared for potential investors. This due diligence process is a critical safeguard for investors and a fundamental legal obligation of the sponsors, the depositor/issuers and the underwriters.

## 2.    The Rating Process for PLMBS

57.    Because, like many institutional investors, the Bank was permitted to buy only AAA rated tranches of those securities, the credit rating of the tranches of PLMBS it purchased was material to its investment decision.

58.    In any PLMBS, the credit rating of each tranche is negotiated between the depositor/issuer of the securities and the credit rating agencies. In this process, the depositor/issuer provides the credit rating agency with the purported characteristics of the

underlying asset pool. The credit rating agency is then supposed to evaluate, among other things:

      a.     The credit quality of the collateral – *i.e.*, the underlying obligor's ability to pay and the obligor's equity in the asset;

      b.     The experience and underwriting standards of the originators of the underlying loans;

      c.     The loan characteristics reported by the depositor/issuer as underlying a particular transaction;

      d.     The default rates, historic recovery rates, and concentration of the loans;

      e.     The ability of the servicer to perform all the activities for which the servicer will be responsible; and

      f.     The extent to which the cash flow from the collateral can satisfy all of the obligations of the PLMBS transaction. The cash flow payments which must be made from the asset pool are interest and principal to investors, servicing fees, and any other expenses for which the depositor/issuer is liable. The rating agencies are supposed to stress-test the flow of funds to determine whether the cash flows match the payments that are required to be made to satisfy the depositor/issuer's obligations.

    59.    After evaluating these factors, the credit rating agency issues a rating for the security. This credit rating should be a reflection of both the riskiness of the loans in the asset pool and the seniority of the tranche. If the rating that the credit rating agency assigns to the tranche is not in accord with the issuer's target, then the depositor/issuer may "**credit enhance**" the structure. Such credit enhancement may include overcollateralization (*i.e.*, including in the

pool mortgages whose aggregate principal balances exceeds the aggregate principal balances of the certificates secured thereby), cash reserve accounts, excess spread (scheduled cash inflows from the mortgages in excess of the interest service requirements of the secured certificates), or third party contracts (whereby losses suffered by the asset pool are absorbed by an insurer or other counter party). By using credit enhancement, a depositor/issuer may be able to elevate a bond to the highest credit rating.

60. All of the Certificates that the Bank purchased were senior certificates that were rated AAA when the Bank purchased them.

61. The following graphic illustrates the securitization process:



**B. The Mortgage Originators Abandoned Underwriting and Appraisal Standards.**

**1. The Shift from "Originate to Hold" to "Originate to Distribute" Securitization Incentivized Mortgage Originators to Disregard Loan Quality.**

62. As noted above, the fundamental basis upon which mortgage pass-through certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral for those loans. If the borrowers cannot pay, and the collateral is insufficient, the cash flow from the certificate diminishes, and the investors are exposed to losses. For this reason, the underwriting standards and practices of the mortgage

29

originators who issued loans that back MBS, and the representations in the Offering Documents regarding those standards, are critically important to the value of the securities, and the investors' decisions to purchase the securities.

63.    Yet, unbeknownst to the Bank, during the time frame that the Bank purchased the PLMBS at issue in this case, mortgage originators: (a) effectively abandoned their stated underwriting standards; (b) allowed pervasive and systematic exceptions to their stated underwriting standards without proper justification; (c) adopted practices such that variance from their stated underwriting practices was the norm; and (d) disregarded credit risk and quality controls in favor of generating loan volume.  As has only now become clear, these changes in origination practices occurred in tandem with a fundamental shift in the mortgage securitization markets.

64.    In the 1980s and 1990s, under the traditional model, mortgage originators held the mortgage loans they provided to borrowers through the term of the loan. They would therefore profit from the obligor's payment of interest and repayment of principal, but also bear the risk of loss if the obligor defaulted and the property value was insufficient to repay the loan.  As a consequence of this arrangement, the originator was economically vested in establishing the creditworthiness of the obligor and the true value of the underlying property by appraising it before issuing the mortgage loans.

65.    Additionally, the mortgage securitizations that took place in the 1980s and 1990s generally fell within the domain of GSEs Fannie Mae and Freddie Mac.  These GSEs purchased the loans from the originators, securitized them, and sold them to investors.  Investors in the early GSE securitizations were provided protections because the underlying loans were originated pursuant to strict underwriting guidelines, and the GSEs guaranteed that the investors

would receive timely payments of principal and interest. Because the GSEs were perceived as being backed by the federal government, investors viewed the guarantees as diminishing credit risk, if not removing it altogether.

66.     Between 2001 and 2006, however, Wall Street banks moved aggressively into the securitization markets, taking market share away from the GSEs. Unlike the GSEs, the Wall Street banks focused primarily on Alt-A, subprime, and jumbo prime mortgage pools because of the higher fees that were available. Likewise, investors sought higher returns offered by non-agency MBS. As a result, non-agency loan originations and securitizations grew dramatically as shown by the following table:

|  | **2001** | **2006** |
|---|---|---|
| GSE Loan Originations | **$1.433 trillion** | **$1.040 trillion** |
| GSE Securitizations | **$1.087 trillion** | **$904 billion** |
| Non-GSE Loan Originations | **$680 billion** | **$1.480 trillion** |
| Non-GSE Securitizations | **$240 billion (including $87 billion of subprime and $11 billion of Alt-A securitizations)** | **$1.033 trillion (including $449 billion of subprime and $366 of Alt-A securitizations)** |

*Source: Inside Mortgage Finance (2007).*

67.     Thus, from 2001 to 2006, non-GSE loan originations more than doubled and non-GSE securitizations more than quadrupled, while GSE loan originations and securitization contracted. Moreover, during this time the non-GSE Alt-A and subprime securitization activity skyrocketed, increasing eight-fold during the period from $98 billion to $815 billion.

68.     As the Financial Crisis Inquiry Commission ("FCIC") reported in April 2010, "[t]he amount of all outstanding mortgages held in non[Agency] MBS rose notably from only

$670 billion in 2004 to over $2,000 billion in 2006." This statistic demonstrates the dramatic growth of the PLMBS market during this time. FCIC, "Preliminary Staff Report: Securitization and the Mortgage Crisis." April 7, 2010.

69.     This enormous increase in PLMBS securitization is reflected in the securitization volume of the sponsors of the PLMBS purchased by the Bank. For example, between 2003 and 2006, Citigroup reported that its Prime/Alt-A securitization nearly quintupled, from $2.2 billion to $10.9 billion, and its subprime securitization increased from $306 million to $10.3 billion (3000%+ increase). Other sponsors – primarily Wall Street banks – similarly expanded their securitization business during the same time period.

70.     This shift was fueled by the complex interaction between record high global savings, referred to by Federal Reserve Chairman Ben Bernanke as the "global savings glut," and exceedingly low interest rates. Low interest rates made it easier and more appealing for consumers to take out home mortgage loans. But the low Federal Reserve rate also meant that the global pool of investors received only marginal returns on traditional low-risk investments, in particular U.S. Government Bonds. This created an incentive for Wall Street banks to create seemingly low-risk investment options that produced returns in excess of those of government bonds. PLMBS securitization was their answer. Thus, following the model created by the GSEs, the Wall Street banks began buying pools of mortgages from mortgage originators, securitizing the pools, and selling the bonds to global investors. Because mortgage interest rates (and even more so Alt-A and subprime rates) generally exceeded those of U.S. Government bonds, the resulting PLMBS could provide investors with the higher rate of return they were seeking.

71.     The one complication that the Wall Street banks needed to solve was the rating of the securities.  Debt securities secured by pools of mortgages made to lower credit quality borrowers would generally fail to meet the investment grade requirements of most institutional investors.  The Wall Street banks' solution was to divide up the risks into "tranches" as discussed above, referred to generally as "structured finance."  As a general rule, this allowed Wall Street to convert up to 80% of any particular PLMBS into "investment grade" securities.  The remaining 20% was often purchased by hedge funds and other entities that were able to buy non-investment grade securities.  The development opened the floodgates for the securitization and sale of PLMBS.

72.     To ensure that the flood did not abate, the Wall Street banks bankrolled the lenders (both the ones they owned and those that were independent) so that the lenders had ample capital to issue loans.  Indeed, a recent study by The Center for Public Integrity found that 21 of top 25 subprime lenders (in terms of loan volume) were either owned outright by the biggest banks or former investment houses, or had their subprime lending hugely financed by those banks, either directly or through lines of credit.  *See* Who is Behind the Financial Meltdown? The Top 25 Subprime Lenders and Their Wall Street Backers, The Center for Public Integrity (May 6, 2009), http://www.publicintegrity.org/investigations/economic_meltdown/ (visited Sept. 20, 2010).

73.     As the PLMBS market expanded, the traditional "originate to hold" model morphed into the "originate to distribute" model.  Under the new "originate to distribute" model, mortgage originators no longer held the mortgage loans to maturity.  Rather, mortgage originators sold the loans to Wall Street banks and other major financial institutions and shifted the risk of loss to the investors who purchased an interest in the securitized pool of loans.

74.     The new distribution model was highly profitable for the mortgage originators in the short term.  By securitizing and selling the mortgages to investors through underwriter/dealers, the mortgage originators shifted loans off their books, earned fees and, thus, were able to issue more loans.  Additionally, the securitization process enabled the originators to earn most of their income from transaction and loan-servicing fees, rather than (in the traditional model) from the spread between interest rates paid on deposits and interest rates received on mortgage loans.  This created an unchecked incentive to originate more and more loans to feed into the securitization machine.

75.     In testimony before the Financial Crisis Inquiry Commission ("FCIC"), Sheila C. Bair, Chair of the Federal Deposit Insurance Corporation, explained both the misalignment of incentives arising from the sale of loans and the misalignment created by flawed compensation practices within the origination industry:

> The standard compensation practice of mortgage brokers and bankers was based on the volume of loans originated rather than the performance and quality of the loans made. From the underwriters' perspective, it was not important that consumers be able to pay their mortgages when interest rates reset, because it was assumed the loans would be refinanced, generating more profit by ensuring a steady stream of customers. The long-tail risk posed by these products did not affect mortgage brokers and bankers' incentives because these mortgages were sold and securitized.

76.     An internal memorandum drafted by the former Credit Risk Officer at Countrywide Financial demonstrates how originators recognized the link between reduced underwriting standards and the ability to pass the resultant associated risks on to third parties. The Credit Risk Officer explained that "[Underwriting] Guidelines have become more aggressive .... Furthermore, the portion of our nonconforming loans that are expanded criteria has increased.  Because the sub holders bear most of the credit risk we are not directly exposed to the expansion of guidelines or change in mix." Declaration of Paris Wynn In Support of

Plaintiff SEC's Ex Parte Application for Relief from Deposition Duration Limit for Deposition of John P. McMurray, *SEC v. Mozilo, et al.* (No. 09-3994) (C.D. Cal.), Ex. 1.

77.     Similarly, as reported in the *Seattle Times*, executives at Washington Mutual ("WaMu") recognized and responded to the same incentive. "Now it [WaMu] began bundling ARMs and certain other mortgages into securities and selling them off -- pocketing hundreds of millions of dollars in fees immediately, while offloading any potential repayment problems. ... [At this time] Killinger hired Craig Davis, American's director of mortgage origination, to run WaMu's lending and financial services. Davis, several former WaMu executives said, began pushing WaMu to write more adjustable-rate mortgages, especially the lucrative option ARMs. 'He only wanted production,' said Lee Lannoye, WaMu's former executive vice president of corporate administration. 'It was someone else's problem to worry about credit quality, all the details.'" Drew DeSilver, *Reckless Strategies Doomed WaMu*, Seattle Times, Oct 25, 2009, at A1.

78.     As far as lenders were concerned, their profits were generated by origination of as many loans as possible, and once these loans were packaged and securitized, repayment risk was someone else's problem.

79.     As Ben Bernanke, Chairman of the Federal Reserve Bank, explained in Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on the terms of the sale, much or all of the risks are passed on to the loan purchaser. Thus, originators who sell loans may have less incentive to undertake careful underwriting than if they kept the loans. Moreover, for some originators, fees tied to loan volume made loan sales a higher priority than loan quality. This misalignment of incentives, together with strong investor demand for securities with high yields, contributed to the weakening of underwriting standards.

**2.      Mortgage Originators Abandoned Underwriting Guidelines in Order to Initiate High Cost Loans for Securitization.**

80.      The misalignment of incentives following the shift to the "originate to distribute model," noted by Mr. Bernanke and others following the collapse of the mortgage market, caused mortgage originators to violate their stated underwriting and appraisal standards, and to accept, encourage and even fabricate their own untrue information from loan applicants. This was not a problem limited to one or a few mortgage originators, but, rather, was pervasive among mortgage originators, including those that issued the loans that backed the PLMBS purchased by the Bank. Mortgage originators and the financial institutions that bankrolled them sought loan volume, not loan quality, in order to profit from the securitization market.

81.      In addition, coincident with the widespread transfer to MBS purchasers of the default risk attached to mortgage loans, in a marked departure from traditional mortgage origination procedures, originators greatly expanded their use of reduced documentation programs in which the verification or substantiation of the applicant's statements as to income, assets and employment history was limited or non-existent. While these programs were touted as providing for "streamlined" underwriting, in fact they were devices whereby originators could make loans to borrowers who would never otherwise have qualified. When these loans were securitized, investors were assured that reduced documentation programs were available only where the borrower satisfied certain FICO criteria, such as minimum FICO scores or loan-to-value and debt-to-income ratios  In fact, the originators lacked any principled basis on which to evaluate the increased credit risk posed by what would eventually become colorfully and generally accurately known as "Liar Loans," or "NINJA loans" (for "no income, no job or assets") loans. Moreover, the widespread granting of exceptions to underwriting standards meant that the minimal safeguards associated with the reduced documentation programs were

36

often abandoned in the headlong rush to maximize origination volume.  Additionally, mortgage underwriters would often begin the underwriting of an applicant's loan under full documentation procedures, only to transfer the loan applicant to a "No Doc" program upon learning of information that would disqualify the applicant under the full documentation procedures.

82.     As John C. Dugan, Comptroller of the Currency testified to the FCIC on April 8, 2010, following his description of poor underwriting practices:

> The combination of all the factors I have just described produced, on a nationwide scale, the worst underwritten mortgages in our history. When house prices finally stopped rising, borrowers could not refinance their way out of financial difficulty. And not long after, we began to see the record levels of delinquency, default, foreclosures, and declining house prices that have plagued the United States for the last two years – both directly and through the spillover effects to financial institutions, financial markets, and the real economy.

**3.     Mortgage Originators Manipulated Appraisals of Collateralized Real Estate in Order to Initiate Loans for Securitization.**

83.     Accurate appraisals prepared in accordance with established appraisal standards are absolutely essential for MBS investors to evaluate the credit risk associated with their investment.  Indeed the loan-to-value metric is among the most significant characteristic of a mortgage pool because it defines the extent of the investors "equity cushion" (*i.e.*, the degree to which values may decline without the investor suffering a loss), and it is strongly indicative of the borrowers' likelihood of defaulting (because as a borrower's equity decreases, particularly to single digit percentages or below, the borrower's incentive to keep the mortgage current, or the property in good condition, decreases dramatically).  But in the absence of properly prepared appraisals, the value component of the loan-to-value metric is unreliable and the metric itself becomes meaningless.  The appraisal practices of the mortgage originators who issued loans that back PLMBS, and the accuracy of the representations in the Offering Documents regarding those

practices, were critically important to the value of the securities, and to the investors' decisions to purchase the securities.

84.     Appraisers are governed by the Uniform Standards of Professional Appraisal Practice ("USPAP"), which is promulgated by the Appraisal Standards Board. The USPAP contains a series of ethical rules designed to ensure the integrity of the appraisal process. For example, the Third USPAP Ethics Conduct Rule provides: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

85.     The Fifth USPAP Ethics Conduct Rule states: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

86.     The Second USPAP Ethics Management Rule states:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1. the reporting of a predetermined results (e.g. opinion of value);

2. a direction in assignment results that favors the cause of a client;

3. the amount of a value opinion;

4. the attainment of a stipulated results; or

5. the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

87.     The Appraisal Standards Board also issues Advisory Opinions regarding appropriate appraisal conduct. For example, Advisory Opinion 19 states in part:

Certain types of conditions are unacceptable in any assignment because performing an assignment under such condition violates USPAP. Specifically, an assignment condition is unacceptable when it:

- precludes an appraiser's impartiality because such a condition destroys the objectivity and independence required for the development of credible results;

- limits the scope of work to such a degree that the assignment results are not credible, given the intended use of the assignment; or

- limits the content of a report in a way that results in the report being misleading.

88.     Despite the importance of accurate appraisals and the requirements that are designed to ensure them, during the time frame that the Bank purchased the PLMBS at issue in this case, mortgage originators routinely manipulated the process for appraising the collateralized real estate properties. They did so by pressuring and coercing appraisers, and blacklisting those that would not "come back at value." The prevalence of this problem and its impact on the financial crisis has been extensively investigated and examined in the aftermath of the market collapse.

89.     According to his statements submitted in connection with his April 7, 2010 testimony before the FCIC, Richard Bitner, a former executive of a mortgage lender for 15 years and author of the book *Confessions of a Subprime Lender*, explains:

> [T]he appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted . . . .[and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value. . . . Throwing a dart at a board while blindfolded would've produced more accurate results.
>
> ...
>
> If the appraisal process had worked correctly, a significant percentage of subprime borrowers would've been denied due to lack of funds. Inevitably, this would have forced sellers to drop their exorbitant asking price to more reasonable levels. The rate of property appreciation experienced on a national basis from 1998 to 2006 was not only a function of market demand, but was due, in part, to the subprime industry's acceptance of overvalued appraisals, coupled with a high percentage of credit-challenged borrowers who financed with no money down.
>
> ...
>
> [T]he demand from Wall Street investment banks to feed the securitization machine couple[d] with an erosion in credit standards led the industry to drive itself off the proverbial cliff.

The Financial Crisis Inquiry Commission, Official Transcript, Commission Hearing, Apr. 7, 2010, Session 2, at 9-10.

90.     Manipulation and abuse of the appraisal process was not confined to the origination of subprime mortgages.  Confirming the extent of the problem, a survey of 1,200 appraisers conducted by October Research Corp., found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through during the period at issue. The study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

91.     As a result of widespread appraisal abuse, the Dodd-Frank Wall Street Reform and Consumer Protection Act, § 1472, amended Chapter 2 of the Truth in Lending Act, 15 U.S.C. § 1631, *et seq.*, to specifically prohibit actions the violate "appraisal independence." Under the new Act, acts or practices that violate appraisal independence include:

> (1) any appraisal of a property offered as security for repayment of the consumer credit transaction that is conducted in connection with such transaction in which a person with an interest in the underlying transaction compensates, coerces, extorts, colludes, instructs, induces, bribes, or intimidates a person, appraisal management company, firm, or other entity conducting or involved in an appraisal, or attempts, to compensate, coerce, extort, collude, instruct, induce, bribe, or intimidate such a person, for the purpose of causing the appraised value assigned, under the appraisal, to the property to be based on any factor other than the independent judgment of the appraiser;
>
> (2) mischaracterizing, or suborning any mischaracterization of, the appraised value of the property securing the extension of the credit;
>
> (3) seeking to influence an appraiser or otherwise to encourage a targeted value in order to facilitate the making or pricing of the transaction; and
>
> (4) withholding or threatening to withhold timely payment for an appraisal report or for appraisal services rendered when the appraisal report or services are provided for in accordance with the contract between the parties.

92.     All of the abuses targeted by the amended Truth in Lending Act were widespread during the time frame that the Bank purchased the PLMBS at issue, causing the appraisals of the collateralized real estate backing the PLMBS to be inflated.

**4.     Widespread Delinquencies Reflected the Inevitable Consequence of Loans Issued Without Meaningful Underwriting.**

93.     High delinquency rates are reflective of a systematic disregard for underwriting guidelines by mortgage issuers.  When effective underwriting occurs, poor credit risks are screened out.  Indeed, that is the purpose of underwriting.  In the absence of effective underwriting, loans are made to unqualified borrowers and fraud is not detected.  When borrowers are loaned money without regard to their ability to repay it, loan delinquencies (and foreclosures) ensue.  Hence, high delinquency rates in loans issued by an originator provide evidence that the originator failed to adhere to prudent underwriting practices.

94.     Numerous studies and analyses have traced the effect of poor underwriting on early payment default and delinquency rates.  For example, the Federal Bureau of Investigation Mortgage Fraud Reports of 2006 and 2007 reported on the results of a BasePoint Analytics study of three million residential mortgage loans which found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The BasePoint Analytics study found that loans containing egregious misrepresentations were five times as likely to default in the first six months as loans that did not.

95.     An analysis of the same BasePoint Analytics study by Fitch Ratings concludes that "[h]igh risk products, which require sound underwriting and which are easy targets for fraud, account for some of the largest variances to expected default rates."  Fitch notes that "in the absence of effective underwriting, products such as 'no money down' and 'stated income'

mortgages appear to have become vehicles for misrepresentations or fraud by participants throughout the origination process."

96.     Moreover, scholarly analysis of recent mortgage default rates has confirmed that increased delinquency rates during this period were not the result of deterioration in the credit characteristics set forth in the underwriting standards disclosed to investors, but rather they resulted from deterioration in credit characteristics of the borrowers that were not disclosed to investors.  Research by University of Michigan economists indicates that increased use of low documentation underwriting – with its higher potential for borrower fraud and other abuses not discernible by MBS investors – correlates to excessive default rates.  Of course, the defaults are not the result of the lack of full documentation in and of itself, but rather because of the underlying credit characteristics of the borrowers that could be masked by the borrowers and unscrupulous mortgage underwriters through the use of limited documentation.

97.     Data collected on the performance of loans over the past several years and analyzed in these studies show that early payment default and delinquency rates have in fact soared as a result of faulty underwriting:



Delinquency Rates by Loan Age & Vintage*

*Includes loans 90 days or more past due or in foreclosure.
Note:  Q1 originations only.
Source:  First American LoanPerformance.

98.     Review of current performance data of pools of loans securitized by the financial

institutions who sponsored the PLMBS purchased by the Bank, as well as the specific loan pools

backing the PLMBS purchased by the Bank, similarly show significantly increased incidence of

delinquency, default and foreclosure, indicating pervasive underwriting failures by the mortgage

originators at issue.

**C.     Federal and State Investigations, Press Reports, Publicly Available Documents
        Produced in Other Civil Lawsuits, and Analysis of the Mortgage Pools Underlying
        the Securities Identify Systematic Violation of Underwriting Guidelines by
        Mortgage Originators Whose Loans Back the PLMBS in this Case.**

99.     The loans backing the PLMBS purchased by the Bank were originated by

numerous entities for which the evidence, including the analysis discussed later in this

complaint, demonstrate their significant deviation from stated underwriting guidelines as

described in the Offering Documents.   Indeed, five of the originators of many of the mortgages

that secure the PLMBS purchased by the Bank – Countrywide, American Home Mortgage,

IndyMac Bank, Wells Fargo and GreenPoint Mortgage Funding – were included in a list

published by the Office of the Comptroller of the Currency ("OCC") of the "Worst of the Subprime Lenders." *See* OCC's "Appendix B: Activities of the National Banks Related to Subprime Lending, Attachment 2 "Worst Ten of the Worst Ten: Update." These originators did not confine themselves to subprime mortgage origination, however, and neither were the flawed underwriting and other improper practices described by the OCC confined to their subprime originations. The origination practices of these and other mortgage originators who issued the loans underlying the PLMBS purchased by the Bank have been the subject of numerous investigations and reports. A review of these investigations, reports and related litigation, as well as confidential witness testimony obtained during the Bank's investigation demonstrate that these mortgage originators systematically violated and ignored their stated underwriting standards and guidelines, rendering the statements in the Offering Documents regarding underwriting practices materially misleading. While a number of these investigations pertain ostensibly to "subprime" mortgage origination, on information and belief, and evidence gathered by the Bank in its investigation to date, the same underwriting abuses occurred with respect to lending activities characterized by the originators as "prime."

1.   **Countrywide Home Loans, Inc.**

100.   Countrywide Home Loans, Inc. ("Countrywide") originated underlying mortgage loans securing at least eleven of the PLMBS purchased by the Bank. Countrywide was the nation's largest mortgage lender between 2004 and 2007.

   a.   **Government actions against Countrywide demonstrate Countrywide's failure to adhere to sound underwriting practices.**

101.   On June 4, 2009, the SEC filed a complaint against certain senior Countrywide executives, including Countrywide's President, David Sambol, and its CEO, Angelo Mozilo, *SEC v. Mozilo et al.,* No. 09-3994 (C.D. Calif.). In the Complaint, the SEC alleged that these

three senior officers committed securities fraud by hiding from investors "the high percentage of loans originated that were outside its already widened underwriting guidelines due to loans made as exceptions to guidelines." That SEC complaint detailed how Countrywide was aware internally that its own underwriting guidelines were being ignored and that borrowers were lying about their income in the reduced-documentation application process.

102.    For example, the SEC complaint detailed how "[o]n June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide bank that showed that 50% of the stated income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%. Of those, 69% had an income variance of greater than 50%."

103.    The SEC complaint explained how Countrywide adopted a "matching" strategy to always match whatever product was being offered by other originators in the marketplace. As part of that matching strategy, Countrywide also adopted a policy of underwriting ever more loans based on exceptions to their underwriting guidelines: "The elevated number of exceptions resulted largely from Countrywide's use of exceptions as part of its matching strategy to introduce new guidelines and product changes."

104.    The SEC further explains how, by February of 2007, internal risk management at Countrywide "noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone. … Additionally, [a senior risk manager] warned [Sambol] that 'I doubt this approach would play well with regulators, investors, rating agencies etc. To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines."

105.    In addition, according to the SEC:

[T]he actual underwriting of exceptions was severely compromised. According to Countrywide's official underwriting guidelines, exceptions were only proper where "compensating factors" were identified which offset the risks caused by the loan being outside the guidelines. In practice, however, Countrywide used as "compensating factors" variables such as FICO and loan to value which had already been assessed [in determining the loan to be outside the guidelines].

106.    The SEC complaint quoted an email from CEO Mozilo noting that "he had 'personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." Mozilo explained that Countywide was originating home mortgage loans "through our channels with disregard for process [and] compliance with guidelines."

107.    A December 2007 internal Countrywide memorandum quoted by the SEC states that, "a Countrywide review of loans issued in late 2006 and early 2007 resulted in … the finding that borrower repayment capacity was not adequately assessed by the bank during the underwriting process …. More specifically, debt-to-income ratios did not consider the impact of principal [negative] amortization or any increase in interest."

108.    Countrywide's widespread use of exceptions to its underwriting guidelines were well known within the Company, but permitted because, as recognized by its Chief Risk Officer in 2005, "CW's [Countrywide's] approach to exceptions has been lucrative over the past several years."

109.    On November 3, 2009, the District Court for the Central District of California denied a motion to dismiss the SEC complaint. Judge Walter specifically noted that "neither Countrywide's disclosures nor a careful review of the context of the statements convince this Court that the alleged omissions or misstatements were immaterial or not misleading as a matter of law." *SEC v. Mozilo, et al.*, No. 09-3994, slip op, at 10 (C.D. Cal. Nov. 3, 2009).

110.    Subsequently, on September 16, 2010, Judge Walter denied Countrywide's

motion for summary judgment.  Among other key determinations, the court found:

> [The] SEC has also presented evidence that Countrywide routinely ignored its
> official underwriting guidelines to such an extent that Countrywide would
> underwrite *any* loan it could sell into the secondary mortgage market. According
> to the evidence presented by the SEC, Countrywide typically made four attempts
> to approve a loan. Countrywide first used an automated underwriting system
> known as "CLUES", which applied Countrywide's underwriting guidelines as set
> forth in Countrywide's technical manuals and loan program guides. SF
> 279....CLUES would either approve the loan or "refer" it to a loan officer for
> manual underwriting. SF 280. If that loan officer lacked the authority to make an
> exception to Countrywide's underwriting guidelines, the loan was referred to the
> Structured Lending Desk, where yet another underwriter, with even more
> authority to waive guideline requirements, attempted to make the loan. Adler Dep.
> 31:23-33:4, July 15, 2010. If that attempt failed, the loan was referred to
> Countrywide's Secondary Markets Structured Lending Desk. SF 282, Adler Dep.
> 32:9-33:4. According to the testimony of the Managing Director of Countrywide
> Home Loans' Secondary Marketing Division, once the loan was referred to
> Countrywide's Secondary Markets Structured Lending Desk, the sole criterion
> used for approving the loan was whether or not the loan could be sold into the
> secondary market. SF 282. As a result of this process, a significant percentage
> (typically in excess of 20%) of Countrywide's loans were issued as exceptions to
> its official underwriting guidelines. SF 293-294. As reported in one Corporate
> Credit Risk Committee meeting, one third of the loans referred from CLUES
> missed "major guidelines" and another one third missed "minor" guidelines. SF
> 289. In light of this evidence, a reasonable jury could conclude that Countrywide
> all but abandoned managing credit risk through its underwriting guidelines, that
> Countrywide would originate any loan it could sell, and therefore that the
> statements regarding the quality of Countrywide's underwriting and loan
> production were misleading.

*SEC v. Mozilo, et al.*, No. 09-3994, slip op, at 11 – 12 (C.D. Cal. Sept. 16, 2010).

111.    In short, evidence presented to the Court supported the claim that "Countrywide

routinely ignored its official underwriting guidelines, and in practice, Countrywide's only

criterion for approving a loan was whether the loan could be sold into the secondary market." *Id.*

at 12.

112.    The Attorneys General from many states also filed complaints against

Countrywide.  Among them, the Attorney General of California alleged based on its extensive

investigation of Countrywide that the company, "did whatever it took to sell more loans, faster –

including by … disregarding the minimal underwriting criteria it claimed to require." Cal. AG

Countrywide Complaint at 20.

113.    For example, the California Attorney General complaint quotes one former

California loan officer explaining how stated income loans were sold, with a loan officer telling

the borrower "with your credit score of X, for this house, and to make X payment, X is the

income that you need to make"; after which the borrower would state that his or her income was

X. *Id.* at 21.

114.    A similar lawsuit instituted by the Illinois Attorney General, *People and State of

Illinois v. Countrywide Financial Corporation,* No. 08-22994 (Cook County Ch. Ct), detailed

how (a) one Countrywide employee estimated that approximately 90% of all reduced

documentation loans sold out of the Chicago office had inflated incomes; and (b) one of

Countrywide's mortgage brokers, One Source Mortgage, Inc., routinely doubled the amount of

the potential borrower's income on stated income mortgage applications.

115.    The Illinois complaint also detailed how Countrywide created incentives for its

employees to increase the number of loans without concern for ability of the borrower to repay

the loan.  The *New York Times* described the allegations in the complaint as "paint[ing] a picture

of a lending machine that was more concerned with volume of loans than quality."

116.    Among the many other abuses described in the Illinois complaint, the Attorney

General found that:

> [t]hrough the securitization process, Countrywide extracted hefty over-head
> charges, then shifted the risk of the failure of these non-traditional loans to
> investors. Moreover, securitization allowed Countrywide to tap those investors for
> much needed capital to fuel its origination process and reach its goal of capturing
> more and more market share. To facilitate the increase in loan origination volume,
> Countrywide relaxed its underwriting standards even more and sold risky,

unaffordable and unnecessarily more expensive mortgage loans to millions of American homeowners.

Testimony of Illinois Attorney General Lisa Madigan before the FCIC, Jan. 14, 2010.

117.    Similar allegations appear in a complaint filed by the Connecticut Attorney General, *State of Connecticut v. Countrywide Financial Corporation*, No. 08-40390945 (Hartford Super Ct.).

118.    On October 6, 2008, Countrywide entities settled lawsuits brought by eleven State Attorneys General and potential claims by 28 other states, including all of the States in which loans backing the PLMBS purchased by the Bank were issued.  The settlement valued at $8.4 billion resolved charges of violations of predatory lending, unfair competition, false advertising, and violations of banking laws, and required Countrywide to implement a program to modify certain existing loans, particularly high risk loans and pay-option mortgages that were the subject of the Attorneys Generals' investigations.

    **b.    Private actions against Countrywide demonstrate Countrywide's failure to adhere to sound underwriting practices.**

119.    A multitude of private class action and individual cases raise further challenges to Countrywide's underwriting practices – and substantiate the challenges with witness testimony and documentary evidence.  For example, Mark Zachary, a former Regional Vice President of Countrywide's joint venture with KB Homes, Countrywide Mortgage Ventures, LLC, detailed in the complaint filed in *Zachary v. Countrywide Fin. Corp.*, No. 08-0214 (S.D. Tex), how Countrywide blatantly ignored its underwriting policies and procedures.  Mr. Zachary states that in September of 2006 he informed Countrywide executives that there was a problem with appraisals performed on KB Homes being purchased with Countrywide loans, specifically describing how loan officers would help loan applicants to submit applications with false income amounts.

120.   Zachary's observations about problems with appraisals at KB Homes are confirmed by documents reflecting internal correspondence within and between KB Homes and Countrywide filed in *Johnson v. KB Homes et al*, No. 09-972 (D. Ariz.).

121.   For example, on June 8, 2005, Christina Nickerson, a KB Home salesperson wrote: "We have an appraisal issue at IMR Mesa … the [lender's] appraiser can not obtain value…. I have asked the [lender] for a copy of the appraisal, and I requested that she try a more aggressive appraiser…. My suggestion is that we have KBHMC order an appraisal from a KB friendly appraiser and see what happens." KB Home Director of Sales McLaury responds: "I agree, we need to order an appraisal from our KB friendly appraiser[.]" On June 16, the salesperson heard back: "Here's our appraisal at purchase price[,]" but McLaury complains: "It's $1,966 short isn't it? Can Ernie Carver bump it up?" Soon after, McLaury confirms that the maneuvering has worked: "Christina and the Mesa Team, the appraisal will come in at the total sales price…."

122.   In another instance, in July 2006, KB Homes Phoenix Vice President Stacie McDonald asked a KB Homes salesman about a home for which an appraisal was low. The salesman responded: "It was approved at $290,000 with a VC of 38%, however, we were able to push appraisal to $300,000 and the addendum for $300,000 was done yesterday."

123.   Similarly, in October 2007, KB Home Director of Sales McLaury instructs "friendly" appraiser Scott Dugan: "Please base your appraisal on today's base sales price, the options/upgrades the buyer purchased ($40,777), and comps in the neighborhood/area, particularly the one lot 44 (66 Lions Den Avenue) that closed at $248,643." On 10/11/07, Dugan responds: "ok."

124.    When KB Homes salesperson, Peter Manesiotis, reported to his manger, Gregory Victors: "Appraisal came in low. This is a CW deal. How should we proceed?" Victors responded: "Have Countrywide order a second appraisal. KB will pay for it. Speak to [loan officer] or processor to get someone who knows area. This process just worked at Mesquite. Buyer did not know about first appraisal." Manesiotis then instructed that a new appraisal be ordered and "do not notify the buyer about the first appraisal."

125.    Countrywide senior executives were apparently not just aware but actively involved in this conduct. In an August 9, 2006 email sent after an appraisal was below contract price and below the level that KB Homes' hand-picked appraiser, Harry, could reach, Countrywide/CWKB Vice President, Tim Ryan writes: "Eric Sanford the western regional VP of landsafe is reviewing the appraisal – he is as high as it gets at landsafe…. As soon as I hear I will let you know. We are fighting all the way to the top for you …" Ryan later reports: "We were just informed the original appraisal will be amended to Harry's appraisal…. So CW will be able to use the $687,000.00 value." On another occasion Ryan explained one scheme for generating self-perpetuating excessive appraisals: "Going forward I have asked ops to request Harry on homes that are 'decked' out – this way we know max value has been given. Under the new rules we cannot do it often, however once a few closing occur – we have comps!"

126.    More information is provided by the Consolidated Complaint filed in *In re Countrywide Financial Corp. Derivative Litigation*, 07-6923 (C.D. Cal.) on February 15, 2008. The suit against certain Countrywide officers, Board members and others, alleged claims based upon, *inter alia*, a failure of "oversight of Countrywide's lending practices, financial reporting, and internal controls." That complaint details how, as to the specific mortgage backed securities at issue -- all originated by Countrywide or affiliated entities – over 50% of the total mortgage

loan balance in the underlying loans was severely delinquent, in default, repossessed, in bankruptcy, or in foreclosure.  Consistent with the findings of the BasePoint Analytics study previously discussed and this 50% failure rate, the complaint quoted multiple former employees of Countrywide who detailed how Countrywide routinely ignored its own underwriting standards when the company needed to book loans to maintain earnings.

127.    Countrywide's representations regarding its loan origination practices have also been challenged by the leading insurance companies that insured MBS securities sold by Countrywide.  On September 30, 2008, MBIA Insurance, one of the largest providers of bond insurance, filed its complaint in *MBIA Insurance Corp. v. Countrywide Home Loans et al.*, No. 08/602825 (Sup. Ct. Cty. of New York).  This complaint explains how MBIA "provide[d] credit enhancement on the [MBS] - in the form of guarantee of repayment of principal and interest for the [MBS] notes in each securitization," and claims MBIA issued such insurance on the basis of fraudulent representations by Countrywide.

128.    MBIA explains that:

> MBIA's re-underwriting review has revealed that 91% of defaulted or delinquent loans in these fifteen Countrywide securitizations show material discrepancies from underwriting guidelines.  ... For example the loan documentation may (i) lack key documentation such as verification of borrower income or assets; (ii) include an invalid or incomplete appraisal; (iii) demonstrate fraud by the borrower on the face of the application; or (iv) reflect that any of the borrower income, FICO score, debt, DTI ["debt-to-income"] or CLTV ratios, fails to meet stated Countrywide guidelines (without any permissible exception).

MBIA specifically notes that "the Defective Loans run across Countrywide's securitizations from 2004-2007, demonstrating the consistency of Countrywide's disregard for its underwriting guidelines during this period."  On April 27, 2010, the Court denied Countrywide's motion to dismiss MBIA's fraud claims.

c.   **Confidential witnesses provide further evidence of Countrywide's failure to adhere to sound underwriting practices.**

129.   Confidential witnesses provided additional evidence of Countrywide's failure to adhere to sound underwriting practices and guidelines. For example, Confidential Witness ("CW")-A, a loan officer who worked at Countrywide from 1997 through 2007, CW-B, a former branch manager and regional vice president for Countrywide Home Loans from September 2005 through December 2007, and CW-C, a loan specialist at a Countrywide Home Loan lender, Full Spectrum Lending, from 2004 to 2005, all confirm that (1) Countrywide employees faced intense pressure to close loans at any cost; (2) Countrywide increasingly approved risky, low- or no-documentation loans without adequate review; (3) Countrywide failed to adhere to underwriting guidelines; (4) Countrywide routinely approved loans that contained exceptions for which there were no reasonable compensating factors; (5) Countrywide employees pressured appraisers to inflate home values; and (6) Countrywide employees manipulated loan data in order to close loans.

130.   Specifically, CW-A stated that employees at Countrywide always faced pressure to produce and close more loans. Because CW-A's performance was judged only on how many loans he closed each month, and not on long-term performance, he used to joke to friends, "I'm fired every month, and then every month they re-hire me."

131.   CW-A stated that from 2004 to 2006, Countrywide's underwriting guidelines became "looser and looser and looser." During this period, the minimum credit scores required for prime or Alt-A mortgages fell repeatedly, such that a borrower with a FICO score of 680 could get a mortgage with a 100% LTV ratio based upon stated income/stated assets documentation. CW-A also stated that Countrywide offered no income/no asset ("NINA") loans, whereby a borrower could obtain a loan without providing any employment, income, or asset

documentation, and did so without any effort or for that matter way to determine whether the borrower had an ability to repay the loan. CW-A further stated that Countrywide frequently offered loans to borrowers who had been rejected by other mortgage providers. In fact, Countrywide loan officers often emphasized to prospective borrowers that Countrywide could do loans that other lenders could not.

132.    According to CW-A, Countrywide had an "Exception Desk," whose purpose was to review loans which didn't strictly meet the underwriting guidelines. During the 2004-2006 time period, CW-A stated that, "It got to where loan approvals with exceptions were the norm."

133.    According to both CW-A and CW-B, Countrywide loan officers pressured appraisers to return values which would allow the loans to be approved. For example, Countrywide loan officers would tell the appraisers that if they did not provide the value the loan officers needed, Countrywide would not send any more work to the appraiser.

134.    Even in circumstances where the appraisers were not directly threatened, Countrywide influenced their appraisal values by telling them exactly what value they needed in order to approve the loan; provided appraisers with the purchase price of the home and the loan amount so that the appraisers could extrapolate the minimum value needed for the appraisal; or sent the appraisers additional comparables that were higher than the ones the appraiser relied upon.

135.    CW-B stated as well that Countrywide's underwriting guidelines became "way too easy" to meet. As a consequence, many of Countrywide's loans ended up in default. Numerous times, he recalled thinking to himself, "people making this kind of money shouldn't qualify for a $400,000 loan." For example, he recalled seeing loan applications for $350,000 homes, with $1,900/month loan payments, when the borrowers were making only $3,000/month.

The DTI ("debt-to-income") ratio on such a loan was approximately 63%. He said such situations were "absurd, but I saw it all the time."

136.   Additionally, CW-B said that most approved mortgages at Countrywide had 95-100% LTV ratios, and most borrowers only put down zero to five percent of the purchase price. Consequently, borrowers had "no skin in the game," and when home values started to drop and the borrowers' loans were for more than the homes were worth, they had no incentive to continue making their mortgage payments. Moreover, CW-B said that Countrywide granted numerous mortgages to borrowers with 65% DTI ratios, and that Countrywide did not require borrowers to have any "reserves" (i.e., cash in their bank accounts) – or, at most, they only had to have one month's reserve – in order to be approved.

137.   CW-B also stated that Countrywide offered a "Fast and Easy" loan program, which required minimal documentation and thereby allowed mortgages to be approved more quickly. It was Countrywide's version of the stated income/stated asset mortgage. In order to determine borrowers' eligibility for the Fast and Easy loan program, Countrywide employees entered data into Countrywide's internally-developed automated underwriting system, called CLUES. CLUES had a flagging mechanism whereby loan officers could not change borrower information and attempt to re-run it through CLUES in order to qualify borrowers for the Fast and Easy loan program. If a loan officer did change such information, CLUES would immediately flag it, decline it for the program, and require full documentation. However, CW-B stated that Countrywide employees bypassed this flagging mechanism by entering inflated borrower information in the first place. For example, they would report a higher monthly income than the borrower actually reported in his or her application. By entering such inflated

information, there was no way for the CLUES system to know that the information was falsified.

Thus, the loan would not be flagged.

138.    CW-B had "no doubt" that there was a lot of upward manipulation of borrower income in order to qualify borrowers for a Fast and Easy loan.  Indeed, CW-B reported one employee to Countrywide's Fraud Department when he caught the employee repeatedly entering fraudulently high income.  However, the Countrywide human resources department said that such reported incidents were not enough to fire the employee, and the employee was simply suspended.  While the employee was suspended, CW-B examined the employee's loan files and found four to five different applications in which the employee had nearly doubled the borrowers' reported income in order to get the loans approved.

139.    CW-C also saw a practice of inflating incomes on stated-income loans when she worked at Countrywide's Full Spectrum Lending division.  On instruction from the branch manager, CW-C said that loan officers "recalculated income and removed [any documents] they didn't want the underwriters to see" in order to push the loans through.  In addition, CW-C knew that loan officers at Countrywide cut and pasted false information into loan documents in order to get loans approved.  "It was a pretty common practice," she said.

   d.    **The mortgages originated by Countrywide and securitized in the PLMBS purchased by the Bank provide further evidence of Countrywide's failure to adhere to sound underwriting practices.**

140.    Countrywide originated mortgages that secured at least Securities BSARM 2007-3 1A1, CWHL 2007-8 1A5, CWHL 2005-8R A1, CWHL 2007-13 A4, GSR 2006-2F 3A1, GSR 2006-AR1 2A3, GSR 2006-1F 2A2, GSR 2005-3F 2A1, GSR 2005-1F 3A1, GSR 2005-2F 2A1, and GSR 2006-6F 2A1.  As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to their weighted average LTV ratio, the

percentages of loans with LTV ratios in excess of 100%, 90% and 80%, the percentage of loans

secured by property not the primary residence of the borrower, and the percentage of loans

originated using full documentation.  Moreover, as described in Paragraphs 369-70 below, many

of these Securities have exhibited excessive delinquency and foreclosure rates.  These

circumstances are strong evidence of Countrywide's failure to observe its stated underwriting

standards.  Countrywide's actual practices – including use of unreliable appraisals, routine

granting of underwriting exceptions and reliance on unverified borrower-supplied information –

caused it to originate loans whose actual LTV ratios and primary residence rates were far

different from that reported in the Offering Documents, and whose likelihood of default was

much higher than that of loans issued under underwriting standards of the type described in the

Offering Documents.

141.    In summary, far from following its underwriting guidelines as described in the

Offering Documents and making occasional, targeted and justified exceptions when other

evidence of ability to repay justified a deviation from the guidelines, in fact at Countrywide

variance from the stated standards was the norm, and many loans were made with essentially

little to no underwriting or effort to evaluate ability to repay.  Nowhere did any of the Offering

Documents apprise the Bank of the extent to which Countrywide deviated from its underwriting

guidelines.

**2.      GMAC and Residential Funding Corp.**

142.    GMAC Mortgage Corporation, which is now known as GMAC Mortgage, LLC,

and its affiliate Residential Funding Corp.  ("RFC") (together, "GMAC") were the originator of

loans for at least three of the PLMBS purchased by the Bank.  Both GMAC's representations

regarding its loan origination practices and the representations of RFC, have been challenged by

MBIA Insurance, one of the largest providers of bond insurance, that insured MBS securities sold by GMAC and RFC.

143.   As stated in its complaint in *MBIA Insurance Co. v. GMAC Mortgage Co.*, No. 600837-2010 (NY State Supreme Court), "To date, MBIA has been able to obtain and review loan files associated with 4,104 delinquent and charged-off loans. ... At least 89% of the 4,104 delinquent or charged off loans reviewed by MBIA were not originated in material compliance with GMAC Mortgage's Underwriting Guidelines or the contractual representations and warranties made by GMAC mortgage."

144.   MBIA further explained that its review found that "A significant number of mortgage loans were made on the basis of 'stated incomes' that were grossly unreasonable or were approved despite DTI or CLTV ratios in excess of the cut-offs stated in GMAC Mortgage's Underwriting Guidelines or in the Purchase Agreements or Prospectus Supplements.... GMAC Mortgage used its proprietary automated electronic loan underwriting program known as 'Assetwise,' ... Assetwise assisted in the underwriting of mortgage loans by automating the process of determining whether a loan met pre-specified underwriting criteria set up by the program. ... Assetwise, however, failed to analyze proposed mortgage loans using criteria set forth in GMAC Mortgage's underwriting guidelines. As a result, GMAC Mortgage routinely contributed loans to the Transactions that failed to comply with its own underwriting standards. . ."

145.   Similarly, MBIA explains in its complaint in *MBIA Insurance Co. v. Residential Funding Corp.*, No. 603552-2008 (NY State Supreme Court): "Of the 1,847 mortgage loans [examined by MBIA] ... only 129 mortgage loans—less than 7% of the mortgage loans reviewed—were originated or acquired in material compliance with RFC's representations and

warranties ... with respect to the underwriting of the mortgage loans contributed to the RFC transactions." The complaint notes that "The Underwriting Guidelines ...only allowed RFC to make exceptions to the Underwriting Guidelines in very specifically defined and limited circumstances. . . . RFC's Underwriting guidelines required that a form—Form 1600—be completed and approve for any exceptions made to the Underwriting Guidelines in connection with the underwriting of purchase of a mortgage loan. [Yet, in fact f]or a significant number of non-compliant mortgage loans, RFC did not identify any specifically defined exception that was permitted under the underwriting Guidelines. Further, for a significant number of mortgage loans, RFC failed to document the alleged exceptions on a form 1600 as required by the Underwriting Guidelines."

146.  GMAC originated mortgages that secured at least Securities GSR 2006-AR1 2A3, RFMSI 2007-S4 A4, and RFMSI 2007-SA4 3A1. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to the weighted average LTV ratios, the percentages of loans with LTV ratios in excess of 100%, 90% and 80%, and the percentage of loans secured by property not the primary residence of the borrower. Moreover, as described in Paragraphs 369-70 below, these Securities have exhibited excessive delinquency and foreclosure rates. These circumstances are strong evidence of GMAC's failure to observe its stated underwriting standards. GMAC's actual practices -- including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to originate loans whose actual LTV ratios and primary residence rates were far different from that reported in the Offering Documents, and

whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

147.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, in fact at GMAC and RFC, variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any of the Offering Documents apprise the Bank of the extent to which GMAC and RFC deviated from their underwriting guidelines.

### 3.    IndyMac Bank, FSB

148.    IndyMac Bank, FSB ("IndyMac") originated underlying mortgage loans securing at least six of the PLMBS purchased by the Bank.  IndyMac also abandoned sound underwriting practices.

#### a.    Government actions and related lawsuits and investigations demonstrate IndyMac's failure to adhere to sound underwriting practices.

149.    As reported in the Audit Report of the Office of Inspector General, Department of Treasury ("OIG"):

> IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well. As an Alt-A lender, IndyMac's business model was to offer loan products to fit the borrower's needs, using an extensive array of risky option-adjustable-rate-mortgages (option ARMs), subprime loans, 80/20 loans, and other nontraditional products. Ultimately, loans were made to many borrowers who simply could not afford to make their payments.

SAFETY AND SOUNDNESS: MATERIAL LOSS REVIEW OF INDYMAC BANK, FSB, OIG-09-032

(February 26, 2009).

150.    In describing what it referred to as IndyMac's "Unsound Underwriting Practices,"

the OIG Audit explained:

> IndyMac encouraged the use of nontraditional loans. IndyMac's underwriting
> guidelines provided flexibility in determining whether, or how, loan applicants'
> employment, income, and assets were documented or verified. The following
> procedures were used by the thrift:
>
> - No doc: income, employment, and assets are not verified
> - No income/no assets (NINA): income and assets are not verified;
>   employment is verbally verified
> - No ratio: no information about income is obtained; employment is
>   verbally verified; assets are verified
> - Stated income: income documentation is waived, employment is verbally
>   verified, and assets are verified
> - Fast forward: income documentation is sometimes waived, employment is
>   verbally verified, and assets may or may not be verified.

151.    The OIG also explained that:

> among other things, we noted instances where IndyMac officials accepted
> appraisals that were not in compliance with the Uniform Standard of Professional
> Appraisal Practice (USPAP). We also found instances where IndyMac obtained
> multiple appraisals on a property that had vastly different values. There was no
> evidence to support, or explain why different values were determined. In other
> instances, IndyMac allowed the borrowers to select the appraiser. As illustrative
> of these problems, the file for one 80/20, $1.5 million loan we reviewed contained
> several appraisals with values ranging between $639,000 and $1.5 million. There
> was no support to show why the higher value appraisal was the appropriate one to
> use for approving the loan.

152.    The OIG Audit contained 6 examples of examined loans with serious

underwriting failings and questionable appraisals.  These included the following examples of

IndyMac's conduct and the losses resulting from IndyMac's violation of underwriting standards

and reliance on faulty appraisals:

Loan 1

> On May 2, 2007, IndyMac approved a $926,000 stated income loan for the
> borrower, ... an adjustable rate mortgage with a 5-year term and a beginning
> interest rate of 5.875 percent, which was subject to change monthly. ...

As a stated income loan, IndyMac performed no verification of the borrower's self-employment income of $50,000 a month ($600,000 annually). IndyMac also did not verify the borrower's assets. ...

The loan file contained an appraisal which indicated that the property value was $1.43 million. This value was based on comparable properties that had been improved with single family residences. However, the comparable properties were located closer to the ocean and bay, and their values were based on listing price instead of the actual selling price. The appraised value also did not take in consideration a slowdown in the real estate market. We saw no evidence in the loan file that IndyMac resolved these and other anomalies with the appraisal.

The borrower made payments totaling $5,389 before defaulting on the loan. The unpaid principal and interest at the time of foreclosure totaled approximately $1.01 million. At the time of our review, the property was listed for sale for an asking price of $599,000.

Loan 2

In November 2007, IndyMac approved a $3 million stated income loan, secured by the borrower's primary residence in Scottsdale, Arizona. The loan proceeds were used to refinance the primary residence which the borrower had owned for 11 years and reported its value as $4.9 million.

As a stated income loan, IndyMac performed no verification of the borrower's reported self-employment income of $57,000 a month ($684,000 annually). Contrary to IndyMac policy, the borrower selected the appraiser who appraised the property at $4.9 million.

Notes in the loan file indicated that the borrower had listed the property for sale in November 2006, first at a price of $4.9 million that was later reduced to $4.5 million before the borrower pulled the property off the market. Despite this, the appraiser concluded that the value of $4.9 million appeared to be reasonable. IndyMac accepted the appraiser's value based on a review of online sale and public records. It did not physically inspect the property.

The borrower made no payments on the loan before default. The total delinquent loan amount as of November 2008 was $3,015,625. According to the IndyMac official, the property sold in October 2008 for $2.0 million.

Loan 3

In February 2007, IndyMac provided the borrower a stated income, 80/20 loan, for a combined total of $1.475 million, to purchase a property in Marco Island, Florida. The combined loan equaled the appraised value of the property.

As a stated income loan, IndyMac performed no verification of the borrower's reported income of $28,500 a month ($342,000 annually). For 80/20 loans,

IndyMac allowed an $800,000/$200,000 maximum loan amount and a maximum combined loan amount of $1 million. This loan was an exception to IndyMac policy as the combined loan amount of $1,475,000 exceeded the maximum combined loan amount. The loan exception was approved anyway.

Various appraisals in the loan file contained significant differences with no indication of how they were resolved by IndyMac. A January 2007 appraisal valued the property at $1.48 million. A valuation analysis prepared by an IndyMac employee on January 25, 2007, stated that the skill level of the appraiser was unacceptable—the appraiser had not provided accurate comparable properties to the subject property and did not accurately consider the location of the property. The IndyMac employee estimated the property value at $1 million and recommended that another appraisal be obtained. Another note in the loan indicated that the IndyMac official overruled the employee's recommendation and the appraisal was accepted. The IndyMac official, however, adjusted the appraised value approximately 10 percent lower, to $1.33 million, citing as a justification that a property on the same street had sold for $1.97 million.

The borrower made no payments before defaulting on the combined $1.48 million loans. According to the IndyMac official, the borrower deeded the property to the thrift in lieu of foreclosure. The IndyMac official estimated in November 2008 that the property was worth about $700,000.

Loan 4

In April 2002, IndyMac approved the borrower for a stated income home equity line of credit of $550,000. This line of credit was in addition to a 80/20 loan for $3 million that the borrower already had with IndyMac. The borrower reported that the property was worth $5.2 million.

As a stated income loan, IndyMac performed no verification of the borrower's reported gross income of $95,000 a month ($1.14 million annually) as the owner/manager of a limited liability corporation. The loan notes history did not indicate how IndyMac resolved negative information revealed in credit reports on the borrower. Two credit reports obtained in March 2002 listed serious and frequent delinquencies. An earlier credit report had noted a discrepancy with the borrower's social security number.

Various appraisals in the loan file also contained significant discrepancies with no indication of how they were resolved by IndyMac. Specifically, the appraisal for the original 80/20 loan, dated in October 2001, valued the property which the appraisal described as new construction at $5.2 million. This same value was reported by a second appraisal dated in March 2002. A third appraisal, dated in April 2002, placed the market value of the home at $508,500. The appraisal stated that the home was less than ½ mile from a hazardous waste facility. A fourth appraisal, also prepared in April 2002, valued the property at $730,000, with the

lowest reasonable value at $590,000 and the highest reasonable at $900,000. This appraiser also reported that the home was built in 1959.

The borrower made payments totaling about $11,000 before defaulting on the $550,000 home equity line of credit loan. According to the IndyMac official, the thrift was able to recover approximately $600,000 on both loans. ….

153.     A June 30, 2008 report issued by the Center for Responsible Lending entitled INDYMAC: WHAT WENT WRONG? HOW AN "ALT-A" LEADER FUELED ITS GROWTH WITH UNSOUND AND ABUSIVE MORTGAGE LENDING (the "CRL Report") concluded that IndyMac often ignored its stated underwriting and appraisal standards and encouraged its employees to approve loans regardless of the borrower's ability to repay.

154.     The CRL Report quotes an IndyMac underwriting team leader, Audrey Streater, as stating of her time at IndyMac: "…I would reject a loan and the insanity would begin. It would go to upper management and the next thing you know it's going to closing."

155.     The CRL Report describes the recollection of another former underwriter for IndyMac, Wesley Miller, interviewed by CRL:

when he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it." The refrain from managers, Miller recalls, was simple: "Find a way to make this work."

156.     As to the recollection of another former underwriter interviewed by the CRL,

Scott Montilla, who worked as an underwriter for IndyMac in Arizona …. says that when salespeople went over his head to complain about loan denials, higher-ups overruled his decisions roughly half the time. "I would tell them: 'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,' " Montilla says. "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform."

b. **The mortgages originated by IndyMac and securitized in the PLMBS purchased by the Bank provide further evidence of IndyMac's failure to adhere to sound underwriting practices.**

157. IndyMac originated mortgages that secured at least Securities GSR 2006-1F 2A2, GSR 2005-3F 2A1, GSR 2005-2F 2A1, GSR 2006-6F 2A1, and RAST 2005-A11 2A1. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to their weighted average LTV ratio, the percentages of loans with LTV ratios in excess of 100%, 90% and 80%, and the percentage of loans secured by property not the primary residence of the borrower.  Moreover, as described in Paragraphs 369-70 below, these Securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of IndyMac's failure to observe its stated underwriting standards.  IndyMac's actual practices – including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to originate loans whose actual LTV ratios and primary residence rates were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

158. In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, in fact at IndyMac variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank of the extent to which IndyMac deviated from its underwriting guidelines.

4.    **Washington Mutual Bank**

159.    Washington Mutual Bank ("WaMu") originated underlying mortgage loans

securing at least six of the PLMBS purchased by the Bank.  WaMu as well abandoned sound

underwriting practices, as set forth in more detail below.

> a.    **Government actions and related lawsuits and investigations demonstrate WaMu's failure to adhere to sound underwriting practices.**

160.    As reported at the Permanent Subcommittee on Investigations ("PSI") hearing

examining high risk loan practices, conduct by WaMu, in particular, was summarized as follows:

> **Shoddy Lending Practices.**  WaMu used shoddy lending practices riddled with credit, compliance and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.
>
> **Steering Borrowers to High Risk Loans**.  WaMu too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans.
>
> **Securitizing Delinquency-Prone and Fraudulent Loans.**  At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.
>
> **Destructive Compensation.**  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, [and] paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties ....

161.    A November 2005 review of WaMu loans in southern California found "an

extensive level of loan fraud ... virtually all of it stemming from employees in these areas

circumventing bank policy surrounding loan verification and review."  According to a story in

the *Seattle Times*, "[a]t one California office, 58 percent of loans examined in an internal review

were fraudulent; at another, 83 percent."  Drew DeSilver, *WaMu Execs Knew of Danger*, Seattle Times, Apr. 13, 2010, at A1.

162.    A WaMu PowerPoint presentation, presented to Kerry Killinger, Steve Rotella and many others, as disclosed at the April 13, 2010 PSI hearing, revealed that a WaMu Corporate Credit Review of Wholesale Specialty Lending for September of 2007 found that "132 of the 187 (71%) files were reviewed [and] … confirmed fraud on 115[; 117 were] 'highly suspect.' …. 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income[.] 133 (71%) had credit evaluation or loan decision errors … 58 (31%) had appraisal discrepancies or issues that raised concerns."

163.    Another internal memorandum presented at the PSI hearings, titled "So. California Emerging Markets Targeted Loan Review Results," explained that: "[o]f the 129 detailed loan review[s] that have been conducted to date, 42% of the loans reviewed contained suspect activity or fraud, virtually all of it attributable to some sort of employee malfeasance or failure to execute company policy. … On average, 78% of the funded retail broker loans reviewed were found to contain fraud … principally centered in misrepresentation of loan qualifying data and appraisal issues."

164.    Another exhibit at the PSI hearing explained how: "[o]ne Sales Associate admitted that during that crunch time some of the Associates would 'manufacture' asset statements from previous loan docs and submit them to the LFC.  She said the pressure was tremendous from the LFC to get them the docs since the loan had already funded and pressure from the Loan Consultants to get the loans funded [sic]."

165.    WaMu Senior Mortgage Underwriter Keysha Cooper, who started at WaMu in 2003 and left in 2007, was quoted by  the *New York Times* explaining that: "[a]t WaMu it wasn't

about the quality of the loans; it was about the numbers ... They didn't care if we were giving loans to people that didn't qualify. Instead it was 'how many loans did you guys close and fund?'" Cooper continued to explain how the pressure became intense in 2007 and admitted that "I swear 60 percent of the loans I approved I was made to .... If I could get everyone's name, I would write them apology letters." Was There A Loan It Didn't Like? *New York Times*, Nov. 1, 2008.

166.   In addition, WaMu's appraisal practices have been the target of numerous government investigations and litigation.  On November 1, 2007, the State of New York filed *People of the State of New York v. First Am. Corp. and First Am. eAppraiseIT.*, No. 46796/2007 (N.Y. Sup. Ct.), alleging that eAppraiseIT colluded with WaMu to inflate the appraisal value of homes after WaMu pressured First American to only assign appraisers on WaMu's approved list (which excluded appraisers whose appraisals in the past had come in "too low").

167.   As detailed *supra* in Paragraph 160, the April 2010 Senate PSI hearing into high risk loan practices particularly identified conduct by WaMu, and concluded that it too often steered borrowers into home loans they could not afford, and had an internal compensation system that rewarded loan officers and loan processers for originating such high risk loans.

   **b.    Confidential witnesses provide further evidence of WaMu's failure to adhere to sound underwriting practices.**

168.   Confidential witnesses, such as CW-D, provided further evidence that WaMu abandoned sound underwriting practices. CW-D worked at WaMu from 1987 until 2006.  During her time at WaMu, CW-D held such positions as personal financial manager, assistant branch manager, and branch manager.  In these capacities, CW-D worked in consumer lending, including loan origination.

169.    CW-D saw many "stated income" loans at WaMu.  If the borrower had false documents or if CW-D believed that the borrower's income would not be high enough (as evidenced by paystubs) to qualify for a loan, CW-D would instruct the borrower not to show her the documents and she would simply offer a "stated income" loan.

170.    CW-D also said that underwriters frequently made exceptions on the loans in order to approve them; moreover, she knew who the "lenient" underwriters were and would direct her loans to them so that they would be approved.  CW-D used different tactics in order to get loans approved by the underwriter; for example, she would write the documents up in a special way so that the loans would always be approved, even if a borrower was not strong enough to qualify.

171.    Even if loans were declined by certain underwriters, CW-D said she could always ask for the loan to be reviewed again.  Sometimes she would call the borrower to tell them why a loan was denied, and the borrower would come back with new facts or new documentation. According to CW-D, there was a lot of "fudging" that took place in those situations.

        **c.**    **The mortgages originated by WaMu and securitized in the PLMBS purchased by the Bank provide further evidence of WaMu's failure to adhere to sound underwriting practices.**

172.    WaMu originated mortgages that secured at least Securities GSR 2006-6F 2A1, WAMU 2005-AR14 1A2, WAMU 2005-AR16 1A2, WAMU 2005-AR18 1A2, WAMU 2007-HY1 4A1, WAMU 2007-HY2 1A1. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to their weighted average LTV ratio, the percentages of loans with LTV ratios in excess of 100%, 90% and 80%, the percentage of loans secured by property not the primary residence of the borrower, and the percentage of loans originated using full documentation.  Moreover, as described in Paragraphs 369-70 below,

these Securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of WaMu's failure to observe its stated underwriting standards.  WaMu's actual practices – including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to originate loans whose actual LTV ratios and primary residence rates were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

173.    In summary, far from following its underwriting guidelines as described in the Offering Documents and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, in fact at WaMu variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank of the extent to which WaMu deviated from its underwriting guidelines.

**5.    Wells Fargo**

174.    Wells Fargo originated underlying mortgage loans securing at least seven of the PLMBS purchased by the Bank.  Wells Fargo as well abandoned sound underwriting practices.

**a.    Other investigations and lawsuits and confidential witness testimony demonstrate that Wells Fargo abandoned underwriting guidelines.**

175.    In denying in part a motion to dismiss in *In re Wells Fargo Mortgage-Backed Securities Litigation,* No. 3:09-1376 (N.D. Cal.) (the "*Wells Fargo* Complaint"), the court found that plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting process."

176.    The *Wells Fargo* Complaint is supported by numerous confidential witness statements substantiating the allegations that Wells Fargo abandoned underwriting guidelines, increasingly made exceptions without compensating factors, sacrificed underwriting standards to loan volume, and manipulating loan information in order to close loans without regard to borrowers' ability to repay the loans.

177.    Confidential witnesses contacted in connection with the Bank's investigation provide additional evidence of Wells Fargo's repeated failure to adhere to sound underwriting practices and guidelines.  Statements by confidential witnesses confirm that: (1) Wells Fargo underwriters faced intense pressure to close loans at any cost; (2) Wells Fargo increasingly approved risky, low- or no-documentation loans without adequate review; (3) Wells Fargo routinely approved loans that contained exceptions for which there were no reasonable compensating factors; (4) Wells Fargo employees approved loans with inflated appraisal values; and (5) Wells Fargo employees manipulated data in order to close loans.

178.    Confidential witnesses include CW-E and CW-F. CW-E worked as an underwriter at Wells Fargo for five years and left the company in approximately 2006.  She helped start one of Wells Fargo's wholesale lending offices.  The wholesale lending office received mortgage applications from various brokers in the area and then underwrote, approved, and funded such mortgages.  CW-F was an underwriting manager at a Wells Fargo branch in California from 2004 until late 2007, when Wells Fargo closed the branch.  The branch was a "MAP" center, which was a location where Wells Fargo loans were registered, underwritten, processed, closed, and shipped out for sale in pools.

179.    Wells Fargo employees increasingly disregarded the credit risk of loans and quality controls in favor of generating loan volume.  According to CW-F, this was because loan

officers and underwriters at Wells Fargo received commissions and/or bonuses based on the number of loans closed.

180.    Among Wells Fargo's abuses of underwriting standards, confidential witnesses detailed a practice of approving risky loans based upon little or no documentation.  CW-E explained that underwriters at Wells Fargo's branches used two automated underwriting systems ("AUS"), which were pre-programmed with the minimum credit scores, LTV and DTI ratios, cash reserve levels, and documentation levels needed for the borrower to qualify for the various mortgage products that Wells Fargo offered.  If these AUS returned an "approve" or "accept" result, then Wells Fargo typically approved the application and funded the mortgage.  CW-E commented that she was skeptical of the "approvals" that came from the AUS, and often thought to herself, "How did it approve *this*?"  The systems approved borrowers who "never should have been approved."

181.    For example, the AUS would approve a borrower with recent late payments, a 50-55% DTI ratio, a 650 credit score, and no cash reserves.  CW-E would have questioned such an application.  However, so long as the AUS approved the loan, the underwriters in Wells Fargo's branches were not required to look any deeper.  In CW-E's view, the integrity of mortgage origination "all fell apart when the AUS became the standard."  She explained that by the mid-2000s, when the AUS were being relied upon almost exclusively, she no longer agreed with the loans that were being approved because the underwriting guidelines had become so loose.

182.    According to CW-E, upper level management at Wells Fargo did not want to hear her concerns about mortgages being approved for borrowers with questionable credit, high debt levels, high LTV ratios, or minimal cash reserves.  They were not concerned with such issues because, throughout her time with Wells Fargo, the origination and underwriting emphasis was

completely sales-oriented. According to CW-E, the motto at the company was "sales rules," and underwriters had no say in the kinds of borrowers that the AUS approved.

183. The only time human underwriters were involved in the underwriting process was when the AUS recommended a loan for "refer" instead of "accept." A result of "refer" meant that the application did not meet the underwriting guidelines programmed into the AUS. These loans required manual underwriting, and most of the time they were still approved.

184. CW-E stated that underwriters at Wells Fargo were pressured to approve applications on which the AUS returned a "refer" result because "sales rules." Underwriters were pressured to approve the loans because if they did not, they were at risk of suddenly being fired. As stated by CW-E, "The loan officer or broker would go to the Operations Manager and complain, and suddenly people [underwriters] were no longer there." Additionally, underwriters received e-mails directly from the outside mortgage brokers or loan officers indicating that they weren't happy with the underwriter's decision not to approve an application. Many mortgage brokers expected the underwriter to approve all of his or her loans. In general, CW-E stated that the mortgage brokers and loan officers "learned how to get away with what they needed in order to get the loans approved."

185. CW-E explained that, in deciding whether to approve loans, underwriters disregarded whether the borrower had the ability to repay the loan: "We were just supposed to ignore all the warning signs." Thus, even for government loan programs, LTV ratios were in the range of 95-100%, FICO scores were as low as 550 to 560, and DTI ratios were as high as 55%. Cash reserves were only required "sometimes." Many of the conventional loans that CW-E underwrote between 2004 and 2006 were stated income/stated asset or no-income/no-asset loans.

186.    Confidential witnesses also described Wells Fargo's standard practice of approving exceptions which deviated from prudent underwriting guidelines.  According to CW-F, 30-40% of the time, Wells Fargo loan officers issued exceptions to underwriting guidelines on loans that otherwise would have been rejected.

187.    CW-F noticed that the exceptions that Wells Fargo granted increased in late 2006 or early 2007, in conjunction with Wells Fargo's decision to tighten its underwriting guidelines. Wells Fargo's sales staff could not understand why a loan that would have been approved the prior year could not be approved in the current year, and did not accept the tightened guidelines. According to CW-F, the sales staff "wouldn't take 'no' for an answer," and therefore placed tremendous pressure on the Wells Fargo underwriters to approve their loans.  Even where the Wells Fargo underwriters would deny requests for exceptions, Wells Fargo's sales staff would take their loans to lead underwriters and risk managers to have the decisions overridden. According to CW-F, the increase in exceptions countered Wells Fargo's efforts to tighten the underwriting guidelines.

188.    Confidential witnesses further detailed how mortgages approved by Wells Fargo were based upon inflated appraisal values.  According to CW-E, the outside mortgage brokers who brought the loans to her branch for approval chose the appraisers that they wanted to use. The outside brokers, loan officers, and appraisers all had a vested interest in the appraised value being accepted and the mortgage application being approved by Wells Fargo, since they all made money off of the transaction.  Consequently, they all had a "let's make a deal mentality" about reaching an appraisal value that supported the amount of the mortgage and the home's value.

189.    According to confidential witnesses, Wells Fargo employees manipulated loan data in order to close loans and generate volume. CW-F was aware of circumstances in which loan files were doctored in order for the loans to be approved.

      **b.     The mortgages originated by Wells Fargo and securitized in the PLMBS purchased by the Bank provide further evidence of Wells Fargo's failure to adhere to sound underwriting practices.**

190.    Wells Fargo originated mortgages that secured at least Securities GSR 2006-AR1 2A3, GSR 2005-1F 3A1, WFMBS 2007-10 1A10, WFMBS 2005-AR12 2A2, WFMBS 2006-10 A7, WFMBS 2007-4 A16, WFMBS 2007-11 A2. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to their weighted average LTV ratio, the percentages of loans with LTV ratios in excess of 100%, 90% and 80%, the percentage of loans secured by property not the primary residence of the borrower, and the percentage of loans originated using full documentation. Moreover, as described in Paragraphs 369-70 below, these securities have exhibited excessive delinquency and foreclosure rates. These circumstances are strong evidence of Wells Fargo's failure to observe its stated underwriting standards. Wells Fargo's actual practices – including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to originate loans whose actual LTV ratios and primary residence rates were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

191.    Thus, far from following its underwriting guidelines as described in the Offering Documents and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, at Wells Fargo, variance from the stated

standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay. Nowhere did any Offering Document apprise the Bank of the extent to which Wells Fargo deviated from its guidelines, virtually acting without any underwriting at all.

### 6.    American Home Mortgage

192.    American Home Mortgage originated underlying mortgage loans for at least two of the PLMBS purchased by the Bank. American Home Mortgage as well abandoned sound underwriting practices.

193.    The *Wells Fargo* Complaint details how an internal American Home Mortgage "Credit Update" presentation dated from October 2005 detailed revised credit factors to be used in making loans to high risk borrowers. The Credit Update sets forth the new "guideline interpretations" under a heading "Where We Are Now" which included:

- Not requiring verification of income sources on stated income loans;

- Reducing the time that need have passed since the homeowner was in bankruptcy or credit counseling;

- Reducing the documentation required for self-employed borrowers; and

- Broadening the acceptable use of second and third loans to cover the full property value.

These new guideline interpretations relaxed substantially, or sometimes rendered meaningless, American Home Mortgage's prior underwriting guidelines.

194.    Indeed, the *Wells Fargo* Complaint specifically identifies an internal American Home Mortgage email sent on November 2, 2006, from Steve Somerman, an American Home Mortgage Senior Vice President of Product and Sales Support in California, stating that American Home Mortgage would make a loan to virtually anyone, regardless of the borrower's

ability to verify income, assets or even employment. The email specifically urged loan officers to make stated income loans, no income loans, no asset loans, and No Doc loans.

195.    American Home Mortgage originated mortgages that secured at least Securities GSR 2006-AR1 2A3 and WFMBS 2007-10 1A10. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to their weighted average LTV ratio, the percentages of loans with LTV ratios in excess of 100%, 90% and 80%, the percentage of loans secured by property not the primary residence of the borrower, and the percentage of loans originated using full documentation. Moreover, as described in Paragraphs 369-70 below, these securities have exhibited excessive delinquency and foreclosure rates. These circumstances are strong evidence of American Home Mortgage's failure to observe its stated underwriting standards. American Home Mortgage's actual practices – including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to originate loans whose actual LTV ratios and primary residence rates were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

196.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, in fact at American Home Mortgage variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay. Nowhere did any Offering Document apprise the Bank of the extent to which American Home Mortgage deviated from its underwriting guidelines.

7.      **Chase Home Finance LLC and JPMorgan Chase Bank, N.A.**

197.    Chase Home Finance LLC ("Chase Home Finance") and/or JPMorgan Chase Bank, N.A. ("JPMorgan Chase") originated underlying mortgage loans for at least four of the PLMBS purchased by the Bank.  Chase Home Finance and JPMorgan Chase Bank, N.A. (collectively referred to herein as the "Chase Originators") also abandoned sound underwriting practices.

198.    Confidential witnesses provided evidence of the Chase Originators' widespread and systematic failure to adhere to sound underwriting practices and guidelines.  For example, CW-C, a loan processor and assistant to the branch manager at a Florida branch of Chase Home Finance from April 2006 until August 2007; CW-G, a senior loan underwriter at Chase Home Finance from December 2004 to August 2005; and CW-H, a senior underwriter at JPMorgan Chase from April 2001 to June 2008, confirmed that (1) the Chase Originators' employees faced intense pressure to close loans at any cost; (2) the Chase Originators' employees manipulated loan data in order to close loans; (3) the Chase Originators approved loans based upon inflated appraisal values; and (4) the Chase Originators failed to adhere to sound underwriting guidelines.

199.    CW-C stated that Chase Home Finance employees faced enormous pressure to close loans because their salaries were dependent solely upon quantity.  For example, loan officers only received a salary their first two months at the company.  After the second month, their income was based upon commissions for the number of loans they closed; if they did not close loans, they did not receive a paycheck.  CW-H echoed similar comments, and said that staff underwriters at JPMorgan Chase received a salary plus bonus pay that was based on the quantity of funded loans.

200.    According to CW-C, branch and regional managers pressured loan officers to meet monthly quotas.  If a loan officer worked two months without closing a loan, they could be

fired. Thus, "loan officers walked around on eggshells at month end" for fear of losing their job or not getting the commission that fed their families.

201.    Underwriters at Chase Home Finance also received monthly bonuses based upon the volume of loans closed, and management pressured such underwriters to close loans. CW-C's regional manager would send the branch managers below him to Chase Home Finance's underwriting office in New Jersey "to work the magic" and close the loans.

202.    CW-H said that the pressure for volume resulted in underwriting errors. According to her, "What I struggled with . . . is all they cared about is the number of files you got through, but then on the back end they [management] would say, 'Oh, you missed this or that.'"

203.    Due to the pressure that was placed upon Chase Home Finance employees to close loans at any cost, many employees inflated borrowers' income and modified loan files in order to push loans through. "It was very common to take stuff out of the loan file" in order to get a loan approved, said CW-C. For example, loan officers removed bank statements, paystubs, or other documents which showed the borrower's income so that the loans would not be hindered in closing.

204.    CW-G's statements illustrate similar problems, including that Chase Home Finance closed loans based upon stated incomes that were false and inflated. CW-G recalled circumstances in which mortgage brokers changed applicants' stated incomes before they submitted the loan files to Chase. Then, after the loans closed and weren't performing, Chase Home Finance would contact the borrower and "hear the borrower say, 'I never said I make that much.'"

205.     According to CW-C, "loan officers knew [the borrowers] were making less income" than was stated on the loans because, acting on orders from the branch manager, the loan officers inflated the borrowers' income. As an example, CW-C stated: "You'd see a guy that owned a pizzeria that was making millions and you knew there was just no way."

206.     CW-G also said that he commonly reviewed loan files that contained "questionable" statements of income. In fact, "[i]t happened weekly," said CW-G, and "[y]ou'd see self-employed people, like a landscaper, who stated they made $10,000 a month." When CW-G determined that the stated income was "not do-able," based upon his review of the website salary.com or an occupational jobs handbook, he notified his manager or other supervisors. However, he was always told that "it meets the FICO credit-policy guidelines so we do the loan." According to CW-G, "It really wasn't common sense-based, but based on the FICO scores you could sell the loan to investors. They wanted quantity, not quality."

207.     Knowledge of the inflated incomes flowed to upper-level management at Chase Home Finance because loan officers often brought their loans to the branch manager for help and instruction on how to make them close. In fact, said CW-C, "The branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work." Branch managers also called the regional managers above them to help close problem loans.

208.     CW-H also mentioned that managers at JPMorgan Chase often overturned the decisions of lower-level underwriters to reject stated-income loans. According to CW-H, "If the manager felt the income made sense and the underwriter didn't, the manager could overturn it."

209.     In addition to approving loans based upon inflated incomes, CW-G also said that Chase Home Finance employees approved loans based upon inflated appraisal values.

According to CW-G, Chase Home Finance employees were "not allowed to contest appraisals that appeared to be inflated." As a result of the housing bubble, appraisers overadjusted and ensured that the appraisals came in at or above the sales price. For example, CW-G said he recalled one subdivision in California in which homes sold in the second phase of the subdivision build-out doubled the value of those sold in the first phase, which had occurred just a few months earlier. In this regard, "[t]he first phase appraisals were valued at $200,000. The second phase, based on speculative investors buying and selling, pushed the values to $400,000. You'd look at the comps and there would be two inside the 'division' and one outside, but you couldn't contest the value."

210.    As CW-C summed up the overall attitude at the Chase Home Finance branch where she worked: "It's okay to do what you have to do to get the loans closed."

211.    Chase Home Finance originated mortgages that secured at least Securities CHASE 2005-A2 1A4, GSR 2005-1F 3A1, GSR 2005-2F 2A1, and JPMMT 2005-A8 2A2. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to their weighted average LTV ratio, the percentages of loans with LTV ratios in excess of 100%, 90% and 80%, the percentage of loans secured by property not the primary residence of the borrower, and the percentage of mortgages originated using full documentation. Moreover, as described in Paragraphs 369-70 below, several of these securities have exhibited excessive delinquency and foreclosure rates. These circumstances are strong evidence of Chase Home Finance's failure to observe its stated underwriting standards. Chase Home Finance's actual practices – including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to

originate loans whose actual LTV ratios and primary residence rates were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

212.    In summary, far from following their underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, in fact at the Chase Originators, variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank of the extent to which the Chase Originators deviated from their underwriting guidelines.

## 8.    PHH Mortgage Corp.

213.    PHH Mortgage Corporation originated underlying mortgage loans securing at least one of the PLMBS purchased by the Bank.

214.    Confidential witnesses provided evidence that PHH Mortgage Corp. failed to adhere to sound underwriting practices, and created a culture in which exceptions to underwriting standards were the norm.  Statements by CW-I, a loan counselor and junior underwriter at PHH Mortgage Corp. from 1997 until October 2007, confirm that: (1) PHH Mortgage Corp. employees faced intense pressure to close loans at any cost; (2) PHH Mortgage Corp. increasingly approved risky, low- or no-documentation loans without adequate review; and (3) PHH Mortgage Corp. employees manipulated data in order to close loans.

215.    As a loan counselor, CW-I worked directly with borrowers and financial advisors to process loans.  When she became an underwriter in May 2005, she transitioned to evaluating high-risk mortgage loan applications to determine whether the loans met PHH Mortgage Corp.'s guidelines.  As was the situation with the other mortgage origination companies identified above,

loan officers at PHH Mortgage Corp. received commissions based on the number of loans closed. Thus, employees were pressured to value quantity over quality.

216.    During her time at PHH Mortgage Corp., CW-I said she underwrote loans that clearly contained inflated income values. She knew that the values were inflated because the stated incomes seemed unreasonable; for example, a hairstylist would be making a lot more money per month than was typical for someone in that industry. CW-I said that she looked at the loans and thought, "There's no way." Nevertheless, CW-I approved the loans because the income was "stated and we had to take [the borrower's] word for it."

217.    PHH Mortgage Corp. had a policy which prohibited underwriters from investigating the veracity of stated income. Consequently, underwriters at PHH Mortgage Corp. did not use any tools like Salary.com to verify the borrowers' income. Between 2005 and 2007, CW-I explained that it was common practice across the mortgage industry to accept stated income without further investigation. "They called them liar loans for a reason," said CW-I, "It was the nature of the beast back then."

218.    CW-I also reviewed loan documents that she knew had been altered by the borrower or a loan officer at PHH Mortgage Corp. because "the data did not match up." As an example, CW-I recalled situations in which the borrower's bank statements did not agree with other documents in the loan file.

219.    CW-I said she suspected that PHH Mortgage Corp.'s loan officers removed loan documents from the files if such documents might keep the loans from closing. She knew such practices happened because, "Everybody did it to get the loan approved. That was how it was in the industry."

220.    PHH Mortgage Corp. originated mortgages that secured at least Security GSR 2005-2F 2A1. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing this Security, including misstatements with respect to the percentages of loans with LTV ratios in excess of 100%, 90% and 80%.  Moreover, as described in Paragraphs 369-70 below, this security has exhibited excessive delinquency and foreclosure rates.   These circumstances are strong evidence of PHH Mortgage Corp.'s failure to observe its stated underwriting standards.  PHH Mortgage Corp.'s actual practices – including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to originate loans whose actual LTV ratios and primary residence rates were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

221.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, in fact at PHH Mortgage Corp., variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank of the extent to which PHH Mortgage Corp. deviated from its underwriting guidelines.

## 9.    National City Mortgage Company

222.    National City Mortgage Co. was the mortgage making subsidiary of National City Corporation ("NCC").  National City originated loans for at least two of the PLMBS purchased by the Bank.  National City Mortgage Co. as well abandoned sound loan underwriting practices.

223.    In 2008, NCC disclosed that it was the subject of an informal SEC investigation concerning among other things its loan underwriting practices.

84

224.    The U.S. Department of Housing and Urban Development's Office of Inspector General ("OIG") has repeatedly called into question National City's loan origination practices. The OIG found that multiple deficiencies in compliance with HUD lending guidance "occurred as a result of the Company's dramatic increase in loan volume, and the concurrent staffing shortages caused by such increased volume" and "because National City lacked adequate procedures and controls to ensure its employees followed HUD's requirements."

225.    As a result, OIG recommended that National City indemnify or reimburse HUD for the losses incurred in connection with the improperly submitted loans and pay civil monetary penalties.

226.    OIG Reports in 2006 and 2008 found that National City continued to fail to comply with HUD's requirements regarding loan underwriting and quality control. Audit Report, Office of the Inspector General, National City Mortgage Company Non-Supervised Lender, No. 2006-CH-1014, at 6-8 & 10 (July 31, 2006) ("2006 Audit"); U.S. Department of Housing and Urban Development, Office of Inspector General, Semiannual Report to Congress, October 1, 2007, through March 31, 2008, at 9.  The 2006 Audit found that nearly half the loans in the OIG statistical sample did not fully meet HUD's requirements.  2006 Audit at 1.  The OIG specifically concluded that "the underwriting deficiencies were material as well as technical and included errors and documentation omissions clearly contrary to prudent lending practices. Further, National City incorrectly certified to the integrity of the data supporting the underwriting deficiencies and to the due diligence used in underwriting ..." *Id.* at 2.

227.    Upon information and belief, these same "staffing shortages" and "lack[ of] adequate procedures and controls" led to equally widespread "underwriting deficiencies ... contrary to prudent lending practices" in the issuance of all National City mortgages.

228.    National City originated mortgages that secured at least Securities GSR 2005-3F
2A1, and GSR 2005-2F 2A1. As discussed in detail below, the Offering Documents contained
serious material misstatements regarding specific characteristics of the loan pools securing these
Securities, including misstatements with respect to their weighted average LTV ratio, the
percentages of loans with LTV ratios in excess of 100%, 90% and 80%, the percentage of loans
secured by property not the primary residence of the borrower, and the percentage of loans
originated using full documentation.  Moreover, as described in Paragraphs 369-70 below,
Security GSR 2005-2F 2A1 has exhibited excessive delinquency and foreclosure rates.   These
circumstances are strong evidence of National City's failure to observe its stated underwriting
standards.  National City's actual practices – including the use of unreliable appraisals, routine
granting of underwriting exceptions and reliance on unverified borrower-supplied information –
caused it to originate loans whose actual LTV ratios and primary residence rates were far
different from that reported in the Offering Documents, and whose likelihood of default was
much higher than that of loans issued under underwriting standards of the type described in the
Offering Documents.

229.    In summary, far from following its underwriting guidelines as described in the
Offering Documents and making occasional, targeted and justified exceptions when other
evidence of ability to repay justified a deviation from the guidelines, in fact at National City
Mortgage Co., variance from the stated standards was the norm, and many loans were made with
essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any of the
Offering Documents apprise the Bank of the extent to which National City Mortgage Co.
deviated from its underwriting guidelines.

10.    **First Horizon Home Loan Corporation**

230.    First Horizon Home Loan Corporation ("First Horizon") originated underlying mortgage loans securing at least one of the PLMBS purchased by the Bank.

231.    Confidential witnesses provided evidence of First Horizon's failure to adhere to sound underwriting practices and guidelines.  Statements by CW-J, an underwriter at First Horizon from August 2004 until May 2006, confirm that First Horizon pressured employees to meet high production volumes, to the detriment of quality control.

232.    As an underwriter, CW-J said he found problems in the loans that he reviewed "almost daily."  Most frequently, he saw loan files that were "missing pay stubs" or other documents.  CW-J was required to bring serious errors to the attention of his supervisor, which he did approximately once per week.

233.    In 2006, CW-J stated that his work-production quota doubled from reviewing 5 loans per day to reviewing 10 per day.  Although First Horizon demanded that he review more loans, they did not provide any software or "anything that would make the job go faster."  CW-J felt that he could perform a decent quality-control review of the loans when his quota was 5 per day, but when he was told to review 10 per day his "real fear was degradation of quality."  Nevertheless, First Horizon's emphasis was solely on quantity: according to CW-J, "It was put to me that I had to meet the quota or I'd be let go."  After CW-J regularly fell short of the 10-per-day quota in an attempt to perform a sufficient review, he was counseled for low production volume "two to three times" and ultimately terminated for failing to meet the quota.

234.    First Horizon originated mortgages that secured at least FHASI 2004-7 1A1.  As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pool securing this Security, including misstatements with respect to the percentages of loans with LTV ratios in excess of 100%, 90% and 80%.  This

is strong evidence of First Horizon's failure to observe its stated underwriting standards. First Horizon's actual practices – including the use of unreliable appraisals, routine granting of underwriting exceptions and reliance on unverified borrower-supplied information – caused it to originate loans whose actual LTV ratios were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

235.   In summary, far from following its underwriting guidelines as described in the Offering Documents and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, in fact at First Horizon Home Loan Corp., variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay. Nowhere did any Offering Document apprise the Bank of the extent to which First Horizon Home Loan Corp. deviated from its underwriting guidelines.

**11.   SunTrust Mortgage, Inc.**

236.   SunTrust Mortgage, Inc. (SunTrust), originated, at a minimum, underlying mortgage loans for Certificate STARM 2007-4 2A2. SunTrust as well abandoned sound underwriting practices.

237.   According to its 2006 Form 10-K, SunTrust's only significant concentration of credit risk was in loans secured by residential real estate. At December 31, 2006, SunTrust claimed to have had $47.9 billion in residential real estate loans and home equity lines of credit, representing 39.5% of total loans, and an additional $19.0 billion in commitments to extend credit on such loans.

238.   During 2009, in connection with its announcement that SunTrust Wholesale was "pulling out of the market for FHA loan originations for the next 20-60 days while they evaluate

a number of things," and recognition that "[w]holesale FHA loans with Suntrust are the [ ]

highest delinquency factor in the company," SunTrust admitted that its high delinquencies were

"due to many 'bad' brokers that have since been terminated" and admitted to, in the past

"'train[ing]' brokers or tolerat[ing] submissions that [were] sub-par or with companies who

[could not] originate, [and] process a good loan."

239.    Confidential witness CW-K, a mortgage loan officer at SunTrust from 2005 until

2008, provided further evidence of SunTrust's failure to adhere to sound underwriting practices

and guidelines.  CW-K's statements demonstrate that: (1) SunTrust employees were pressured to

close loans at any cost; (2) SunTrust employees manipulated loan files in order to get loans

approved; (3) SunTrust coaxed elderly borrowers into loans they could not afford; and (4)

SunTrust deviated from its underwriting guidelines and granted exceptions when there were no

reasonable compensating factors.

240.    According to CW-K, SunTrust employees were pressured to close at least $1

million in loans *each month.*  Inside loan officers at SunTrust received a salary and commission

based upon the number of loans closed.  Outside loan officers only worked for commissions, and

did not receive any payments unless they surpassed the quota for closed loans.  As CW-K

explained, if a loan officer surpassed the $1 million quota, they received a set commission; loan

officers who surpassed $2.5 million in closed loans received a $3,000 bonus.  "That's where the

greed came in," said CW-K.

241.    CW-K described SunTrust loan officers as being "cut-throat."  For example,

SunTrust loan officers would team up with realtors to coax elderly borrowers into using

SunTrust as their lender on a new home purchase.  "They'd approach an elderly woman and get

her to list her house," said CW-K, and then the SunTrust loan officers would talk the elderly

woman into buying a new home before the old one had sold. These loan officers would convince

the woman "to go into a balloon note [interest only]" on the new house, but the borrower "never

got her old house closed," so she was left with two mortgages, one of which she could not afford.

"This happened a lot," said CW-K.

242.     Besides issuing loans to borrowers who could not afford them, CW-K explained

that SunTrust employees manipulated loan files in order to get loans approved. According to

CW-K, "there was a lot of crazy paper" at her branch in Florida. For example, CW-K said that

SunTrust loan officers ran loan applications through the desktop underwriting ("DU") system

and if the borrower's "numbers" (LTV and DTI ratios) did not meet the company's guidelines, it

was not uncommon for a loan officer to falsify the ratios and pretend that they never ran the loan

through DU by erasing the evidence. CW-K also recalled that SunTrust loan officers called

borrowers and coached them into giving a verbal statement of their ratios that would enable the

loan to qualify.

243.     Additionally, CW-K said that some loan officers at SunTrust knowingly assisted

self-employed borrowers in inflating their income and employment histories by ignoring false

data in letters provided by the borrowers' certified public accountants. For example, said CW-K,

if SunTrust's loan product guidelines required that a self-employed borrower had to have worked

for a company for a minimum of two years, but the borrower fell short of that timeline, the loan

officer allowed the borrower to file a letter from their CPA falsely alleging that the borrower had

indeed been employed for two years. CW-K said that she knew the letters were falsified because

she knew "the borrower had told the loan officer that they had worked for 'almost two years.'"

244.     CW-K also recalled that some CPA letters falsely supported inflated incomes, but

SunTrust loan officers nevertheless accepted these letters as valid documentations of income.

245.   Besides these examples of manipulating loan files, CW-K also recalled that some loan officers coached borrowers on how to change their tax documentation so that the numbers would support loan approval.  In this regard, CW-K said that SunTrust offered "no-ratio loans" for self-employed borrowers who had been in business for three to five years.  CW-K remembered one borrower who made $250,000 in gross profit and $40,000 in net profits.  Although CW-K refused to grant him a loan, "other loan officers would get the borrower to doctor up their taxes."  In fact, said CW-K, it was not uncommon for CW-K to deny a loan only to have the loan transferred to another loan officer for approval.

246.   CW-K described two reasons that SunTrust approved loans which should not have been approved: (1) "Some loan officers knew how to smooth [CW-K's manager] over with loan documents," so that the manager would not notice false ratios or inflated income; and (2) managers approved loans that did not meet SunTrust's guidelines because the loans came from "high producers" or "strong money makers" for the company.  With respect to the second issue, CW-K explained that if a loan officer closed a lot of loans, they had more room to make exceptions to guidelines.

247.   CW-K said that all of these deviations from underwriting guidelines, which she said were motivated by greed, continued throughout her entire tenure at SunTrust.

248.   As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Securities, including misstatements with respect to their weighted average LTV ratios, the percentages of loans with LTV ratios in excess of 100%, 90% and 80%, and the percentage of loans secured by property not the primary residence of the borrower.  Moreover, as described in Paragraphs 369-70 below, Security STARM 2007-4 2A2 has exhibited excessive delinquency and foreclosure